612 P.2d 475

**The STATE of Arizona, Appellee,**

v.

**Willie Luther STEELMAN, Appellant.**

No. 3299–2.

Supreme Court of Arizona,
In Banc.

April 30, 1980.
Rehearing Denied June 17, 1980.

**20**

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Asst. Atty. Gen., Phoenix, for appellee.

Richard Oseran, Pima County Public Defender by Robert B. Norgren, Deputy Public Defender, Tucson, for appellant.

CAMERON, Justice.

This is an appeal by Willie Luther Steelman from resentences of death for the crimes of first degree murder (two counts). A.R.S. § 13–454.[1] We have jurisdiction pursuant to A.R.S. § 13–4031.

Defendant raises eleven issues on appeal:

1. Was the defendant resentenced illegally under A.R.S. § 13–454, in violation of the statute's severability of sentence clause?

2. Was the defendant resentenced in violation of the double jeopardy clause of the United States Constitution?

3. Was the defendant resentenced in violation of the ex post facto clause of the United States Constitution?

4. Does Arizona's sentencing procedure deny the defendant's right to a jury trial?

5. Was the defendant prejudiced by being resentenced by the judge who originally imposed a death penalty?

6. Did the resentencing procedure unconstitutionally shift the burden of proof to the defendant by requiring him to prove mitigating circumstances?

7. May the defendant be resentenced to death where the State argues a felony murder theory to the jury?

8. Was the defendant prejudiced by the delay in the resentencing?

9. Was the resentencing contrary to Rule 26.14, Arizona Rules of Criminal Procedure, 17 A.R.S.?

10. Was the trial correct in finding aggravating circumstances, pursuant to A.R.S. § 13–454?

11. Did the defendant establish mitigating circumstances sufficient to prevent the imposition of the death penalty?

On 23 July 1975, Willie Luther Steelman was convicted of two counts of first degree

---

1. The Arizona Criminal Code citations contained in this opinion refer to the statutes as they existed prior to the extensive criminal code revision effective 1 October 1978.

murder, A.R.S. §§ 13–451, –452, –453; one count of burglary, A.R.S. § 13–302; one count of kidnapping for robbery with a gun, A.R.S. §§ 13–491, –492; and two counts of armed robbery, A.R.S. §§ 13–641, –643(B). For the circumstances of these crimes, see *State v. Steelman,,* 120 Ariz. 301, 585 P.2d 1213 (1978).

Defendant's convictions were affirmed by this court on 13 September 1978. See *State v. Steelman,* supra. However, we remanded the matter for resentencing on the two murder charges, pursuant to *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), cert. den. 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979). Steelman was resentenced to death on 24 May 1979 and appeals.

## FIRST SIX QUESTIONS

The first six questions were disposed of adversely to defendant in *State v. Watson,* supra, and we see no need to discuss the issues further at this time. We find no error.

## FELONY–MURDER RULE

The defendant contends that since there was evidence in this case that would support a felony-murder theory (A.R.S. § 13–452), and since the prosecutor argued that theory to the jury, he should not be sentenced to death. He notes language by two Justices in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which suggests that the death penalty should not be imposed in a felony-murder situation, because the defendant who is charged with the felony-murder may not have intended that there be a killing.

While it is true that some murderers convicted under the felony-murder rule may have lacked necessary intent for first degree murder, that is not the case before us. Steelman's own statements show that he had the requisite intent to kill. In a confession admitted at trial, he explained how he and his co-defendant, Douglas Gretzler, jointly took Michael Sandberg and his wife Patricia hostage in the Sandberg home. The two disguised themselves, bound the Sandbergs, and waited until nightfall when they could use the couple's car to escape from the police, whom they expected would be looking for them as a result of earlier crimes. In the course of describing these events, Steelman stated:

" * * * we could tell we couldn't walk out of there, we couldn't walk out of there and get in those people's car in the daylight. We thought about taking the people with us and I kept thinking no that car was so small * * *, so we decided, Doug decided the best thing to do would be shoot these people too and then there would be no witnesses, take what we could and run like hell. So this is what happened.

* * * * * *

" * * * We figured it was time to leave. Douglas went into the bedroom and shot the gentleman in the head, he came out he did it with a pillow so there was no noise, the lady I had her roll over on her side facing the couch so that she couldn't see it coming and Douglas shot her, he shot her three or four times and uh, then to make sure she was dead, I put one through her head myself to make damn sure she wasn't still suffering."

We have recently considered this same felony-murder issue in a case where the defendant did the actual killing, but in which a felony-murder instruction had been given to the jury. Citing the concurring opinions by Justices Blackmun and Marshall in *Lockett,* 438 U.S. at 613 and 620, 98 S.Ct. at 2969 and 2972, 57 L.Ed.2d at 996 and 999, we stated:

"Even if the language by the two justices were the holding of the United States Supreme Court, we do not feel that it would apply under the circumstances herein." *State v. Arnett,* 125 Ariz. 201, 608 P.2d 778 (1980).

■ The same holding is appropriate here. This was not a case where the driver waited in the car while his co-defendant unexpectedly killed a shopkeeper or innocent bystanders in the course of a robbery. Steelman took an active and deliberate part in the Sandberg killings. The deaths of the

Sandbergs were a direct result of Steelman's own conduct. We find no error.

## DELAY IN RESENTENCING

Steelman was first sentenced to death on 27 August 1975. An appeal was taken to this court and we remanded for resentencing on 17 October 1978. His second hearing took place on 24 May 1979, seven months later. After the remand, Steelman did not request an earlier resentencing.

At his hearing, Steelman's evidence went, as before, to proving the mitigating circumstance set forth in A.R.S. § 13–454(F)(1):

"1. His capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

Four new witnesses were presented: Larry Evans, Steelman's cell-mate at the Arizona State Prison; Willard Gold, a consulting psychiatrist at the prison; Ethel Rossman, Steelman's mother; and Patricia White, a psychiatrist who treated the defendant for several months after his arrest in California. The State presented no new evidence. Two witnesses who were available at the first hearing, but who were not called, died between the first hearing and the second.

Steelman contends that the delay between his original sentencing and his resentencing violates the right to speedy trial provided by the Sixth and Fourteenth Amendments to the United States Constitution. Specifically, Steelman argues that the passage of time resulted in the loss, by death, of two lay witnesses to his mental condition and that, because of the delay, he suffered extreme anxiety as a result of not knowing whether he would, in fact, be sentenced to death.

■ Although some courts have applied federal speedy trial standards to sentencing, *Juarez-Casares v. United States*, 496 F.2d 190 (5th Cir. 1974); *United States v. Sherwood*, 435 F.2d 867 (10th Cir. 1970), cert. denied 402 U.S. 909, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971); *Brooks v. United*

*States*, 423 F.2d 1149 (8th Cir.), cert. denied 400 U.S. 872, 91 S.Ct. 109, 27 L.Ed.2d 111 (1970); *Gonzales v. State*, 582 P.2d 630 (Alaska 1978), neither the United States Supreme Court nor this court has ever held that the Sixth Amendment speedy trial guarantee includes the right to prompt sentencing. If such a rule were adopted, however, it would follow that the defendant would have to show some prejudice before being able to obtain any relief. No such prejudice is shown here.

Admittedly, the two witnesses who died between the first sentencing and the second sentencing might have shed some light on defendant's mental condition. We note, however, that the two witnesses were available at the time of the first sentencing, and defendant did not call them to testify. This leads us to believe that they were not important to defendant's presentation during the hearing on resentencing. We find no prejudice.

■ As to Steelman's emotional stress while awaiting resentencing, we do not question that, having obtained a redetermination of the death penalty, the defendant experienced distress while the matter was pending. We do not feel this calls for a vacation of his resentencing. There will always be a certain amount of stress associated with sentencing after conviction or, as in this case, after appeal and remand. That a particular defendant suffers emotional stress while awaiting sentencing, even in a death penalty situation, does not call for a speedier determination of that sentence. Indeed, because of the severity of the death penalty, the court may wish to take time to allow the defendant more extensive preparation for the hearing which could result in the most severe of criminal penalties. Balancing these interests, we find no prejudice to the defendant in the delay from remand to resentencing. We find no error.

## VIOLATION OF RULE 26.14

■ Steelman also contends that his resentencing to death violates Rule 26.14, Arizona Rules of Criminal Procedure, 17 A.R.S., which reads in relevant part:

"Where a judgment or sentence, or both, have been set aside on appeal, * * * the court may not impose a sentence for the same offense, * * * which is more severe than the prior sentence unless it concludes, on the basis of evidence concerning conduct by the defendant occurring after the original sentencing proceeding, that the prior sentence is inappropriate."

Steelman's second sentence is not "more severe than the prior sentence." Rule 26.-14, supra. See *Watson*, supra. The two capital sentences are identical. We find no error.

## AGGRAVATING CIRCUMSTANCES

Steelman next challenges the findings of the court as to aggravating circumstances. We have searched the record and made our independent determination of the aggravating circumstances found by the trial court pursuant to A.R.S. § 13–454(E). A.R.S. § 13–1711; *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976), cert. denied 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

### A. PREVIOUS CONVICTIONS

Steelman challenges the sentencing court's finding of aggravation pursuant to A.R.S. § 13–454(E)(1) and (2), which read as follows:

"1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

"2. The defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person."

To prove aggravating circumstances under these provisions, the State introduced certified abstracts of California judgments of guilty on nine first-degree murder counts and five first-degree robbery counts. The defendant argues that these convictions should not be admissible as aggravating circumstances because the convictions were unconstitutionally obtained, and because the acts which served as the basis for the

convictions were committed after the Sandberg murders.

### 1. Constitutionality of the California convictions

On 6 June 1974, Steelman, his California counsel, and the district attorney prosecuting the case appeared before the San Joaquin County Superior Court. At this hearing, defense counsel revealed that, as a result of negotiations between the State and the defendant, Steelman wished to submit his case to the court for trial on the grand jury transcript. In consideration for Steelman's waiving his trial rights, the district attorney would move to dismiss count ten of the indictment (a kidnapping charge).

The trial judge indicated that he was "somewhat reluctant about this procedure." He addressed Steelman directly and at length, explaining the differences between the submission and trial by jury and suggesting that the submission presented many of the disadvantages of a guilty plea. The judge outlined the defendant's trial rights, and he asked questions to determine whether Steelman understood them and whether he was relinquishing them freely. The judge specifically advised Steelman that he had a right to trial by jury, to cross-examine witnesses against him, to present witnesses in his own behalf, and to testify himself. The court did not advise Steelman that he had the right not to incriminate himself. As the hearing ended, Steelman's counsel addressed once more the contrast between the submission and a guilty plea:

"MR. LIBICKI: * * * I do want to clarify one thing, Your Honor. The Court has said in its admonitions, that this was tantamount, or could be compared to a guilty plea. I had advised Mr. Steelman quite to the contrary, that is a trial based on the transcript and his plea of not guilty is in effect—

"THE COURT: That's correct. I didn't intend it in that sense. Let me clarify that. I hope I made it clear, but perhaps I was misunderstood.

But since I have no other evidence to contradict the evidence that is in the grand jury transcript then, of course, I must decide whether or not there are— there is sufficient evidence in the grand jury transcript to determine whether there is guilt beyond a reasonable doubt.

The presumption of innocence, of course, is still applicable and remains until such time as the trier of fact determines guilt beyond a reasonable doubt. That is understood.

"THE DEFENDANT STEELMAN: Yes.

"THE COURT: Does that clarify it for you, Mr. Libicki?

"THE DEFENDANT STEELMAN: Yes.

"MR. LIBICKI: Yes."

At Steelman's request, oral argument "with respect to the transcript" was set for 12 June 1974. On 8 July 1974, judgments of conviction on five counts of first degree robbery and nine counts of first degree murder were entered against Steelman.

Steelman now argues that the resulting convictions are invalid because the submission was tantamount to a guilty plea, and that, since the California court did not make certain that Steelman voluntarily and intelligently waived his privilege against self-incrimination, the convictions may not be used as an aggravating circumstance.

■ Convictions obtained by means of a guilty plea without a valid waiver of the defendant's trial rights are unconstitutional. *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Constitutionally infirm convictions may not be used to enhance punishment under a state recidivist statute, *Burgett v. Texas*, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), nor weighed by a court in sentencing a defendant for a subsequent crime. *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

■ Submission on transcripts, sometimes known as "stipulated bench trials," *People v. Smith*, 59 Ill.2d 236, 319 N.E.2d 760 (1974), or "slow pleas," *Bunnell v. Superior Court of Santa Clara Cty.*, 13 Cal.3d 592, 119 Cal.Rptr. 302, 531 P.2d 1086 (1975), are procedurally distinct from guilty pleas. In some instances, however, submissions are tantamount to a guilty plea because it is obvious that at the time they are made, the defendant has no hope of acquittal. *State v. Woods*, 114 Ariz. 385, 561 P.2d 306 (1977), supplemental opinion 116 Ariz. 110, 568 P.2d 417 (1977); *In re Mosley*, 1 Cal.3d 913, 83 Cal.Rptr. 809, 464 P.2d 473, cert. denied 400 U.S. 905, 91 S.Ct. 144, 27 L.Ed.2d 142 (1970). We have held that in such cases, "[d]ue process requires that the trial court make a record similar to that required by *Boykin v. Alabama*, supra, to determine if the decision to submit the case * * * was freely, intelligently and voluntarily made." *State v. Crowley*, 111 Ariz. 308, 311, 528 P.2d 834, 837 (1974); *State v. Woods*, supra.

■ However, when the submission on the record results in the court's being required to review the record offered to see if there is, in fact, sufficient evidence to convict, the submission is not the same thing as a guilty plea. Such a submission can be "entirely consistent with a defendant's continued assertion of innocence," *People v. Gallegos*, 4 Cal.3d 242, 248, 93 Cal.Rptr. 229, 233, 481 P.2d 237, 241 (1971). "The trial court is exercising its function of determining guilt or innocence," and thus "no guilty plea is involved." *People v. Sullivan*, 72 Ill.App.3d 533, 536, 29 Ill.Dec. 82, 84, 391 N.E.2d 241, 243 (1979). In those cases we have stated:

"In cases in which the submission on the record is not equivalent to a guilty plea, the requirements of *Boykin* are not applicable, but the requirements of due process necessitate that there be a knowing waiver of the constitutional rights relinquished by such submission. It is necessary that the record show that the defendant was advised that he was giving up his right to trial by jury and that the whole issue of guilt or innocence would be decided on the submitted record. In reviewing the transcript we are satisfied that there is a sufficient showing to support the conclusion of the trial judge that there was a knowing waiver." *State v.*

*Gaines,* 113 Ariz. 206, 207, 549 P.2d 574, 575 (1976).

In the instant case, Steelman's submission was not the equivalent of a guilty plea. There was no agreement as to Steelman's being guilty of any charge or as to appropriate sentence; the submission remained an adversary proceeding in which Steelman's attorney was able to, and did, argue in his client's defense after the court had read the transcript of the grand jury. See *State v. Woods,* supra; *State v. Garcia,* 115 Ariz. 535, 566 P.2d 683 (1977). We believe there was a knowing waiver. *Gaines,* supra. The matter was properly submitted to the trial judge for determination. We find no error.

2. Were the previous convictions untimely?

Steelman contends that his California offenses should not be considered as an aggravating circumstance because they were committed after the Sandberg murders. We do not agree.

Recidivist or enhancement statutes, A.R.S. § 13–604 in the new Criminal Code, generally require that the prior conviction be based on an offense committed before the offense for which the defendant is being sentenced. Both the prior conviction and the prior offense must have occurred before the second offense was committed. This view is in harmony with the purpose of the recidivist or enhancement statute, which is to serve as a warning to first offenders and encourage their reformation. However, the death penalty statute, A.R.S. § 13–454(E)(1) and (2), is not a recidivist statute which imposes additional punishment for crimes committed *after* a prior conviction. The statute makes no reference to when the acts underlying those convictions must have been committed. We have stated that the

"purpose of an aggravation/mitigation hearing is to determine the character and propensities of the defendant. * * * Revelation of subsequent lawless acts of violence would help to attain the objectives of the sentencing statute." *State v.*

*Valencia,* 124 Ariz. 139, 141, 602 P.2d 807, 809 (1979).

Under the statute, the sentencing judge may consider the character of the defendant at the time of the sentencing. The judge may take into consideration conduct that occurred after the offense for which he is being sentenced. Indeed, the United States Supreme Court has approved, on resentencing, the consideration of events which occurred after the first sentencing:

"A trial judge is not constitutionally precluded * * * from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.' *Williams v. New York,* 337 U.S. 241, 245, 69 S.Ct. 1079, 1082, 93 L.Ed. 1377. * * * The freedom of a sentencing judge to consider the defendant's conduct subsequent to the first conviction in imposing a new sentence is no more than consonant with the principle, fully approved in *Williams v. New York,* supra, that a State may adopt the 'prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime.' Id., 337 U.S., at 247, 69 S.Ct., at 1083." *North Carolina v. Pearce,* 395 U.S. 711, 723, 89 S.Ct. 2072, 2079–80, 23 L.Ed.2d 656 (1969).

We find this aggravating factor does exist.

**B. RISK OF DEATH TO ANOTHER**

The defendant contends that the sentencing court erred in finding an aggravating circumstance pursuant to A.R.S. § 13–454(E)(3), which states:

"3. In the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense."

On appeal, the State agrees that this circumstance was not shown. We concur. See *State v. Watson,* supra; *State v. Ceja,* 115 Ariz. 413, 565 P.2d 1274, cert. denied,

434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977).

### C. WAS THE CRIME ESPECIALLY CRUEL, HEINOUS OR DEPRAVED?

Steelman argues that the Sandberg murders were not committed in an "especially heinous, cruel or depraved manner," as required to constitute aggravation under A.R.S. § 13–454(E)(6). The trial court found that this circumstance existed because the victims were bound and gagged for a period of several hours prior to their deaths, because "Michael Sandberg's legs were attached by a heavy twine to twine around his neck * * * so as to choke him in the event of his attempt to straighten out his legs," and because Patricia Sandberg was "shot after her husband and within hearing distance of the shot."

The victims were kept prisoner in their own home. They were gagged and bound at the ankles and wrists for an indeterminate period. Michael lay on his bed; Patricia, on the living-room couch. A single strand of 55-pound breaking strength parcel-post twine extended in a V-pattern up Michael's back from his ankles around his neck. Cloth padding was wrapped between both victims' bodies and the twine, to prevent the twine from cutting their skin. A radio was turned up to hide extraneous noise when they were shot. The Sandbergs were prisoners of Steelman and Gretzler for the better part of a day. Both defendants testified that Patricia finally became so frightened and nervous that they gave her Valium to quiet her.

In applying A.R.S. § 13–454(E)(6), we have adopted the common meaning of the terms "heinous," "cruel," and "depraved":

> " 'heinous: hatefully or shockingly evil: grossly bad.
> " 'cruel: disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic.
> " 'depraved: marked by debasement, corruption, perversion or deterioration.' "

State v. Knapp, quoting Webster's Third New International Dictionary, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977), cert. denied 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).

■ We believe that the evidence concerning the Sandbergs' murder indicates that the crime was especially heinous, or shockingly evil. First degree murder is by its nature willful, cruel and repugnant. But the facts of this case set it "apart from the norm of first degree murders." State v. Brookover, 124 Ariz. 38, 601 P.2d 1322 (1979).

The murders were unnecessary. There can be no doubt that the victims suffered mental anguish as a result of being held prisoner for an extended period. Patricia, for example, had to take medication for her highly emotional condition as a result of being held prisoner. They knew that their captors were armed, hiding from the police, and anxious to escape. It may be inferred that throughout their imprisonment, they were uncertain as to their ultimate fate. This uncertainty had to be intensified when they were taken into separate rooms, bound, and gagged. We believe that these circumstances show that the Sandbergs suffered an exceptionally heinous or shocking death, and that, therefore, the aggravation set forth in A.R.S. § 13–454(E)(6) existed in this case.

■ Defendant also contends that since the trial judge in the case of defendant's co-defendant Douglas Edward Gretzler did not find that the crimes were committed in a "heinous" manner even though Gretzler actually "committed the murders," imposing the death penalty in this case is contrary to Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), as being "freakishly" imposed. We do not agree. However we might view the question of whether Gretzler also committed the murders in a heinous manner, the record before us, made at a separate and distinct trial, indicates that Steelman committed the crimes in a heinous manner. We do not believe the death penalty in this case was "freakishly" imposed contrary to Furman, supra.

## MITIGATING CIRCUMSTANCES

Steelman has consistently maintained that he was suffering from severe mental disease at the time of the Sandberg crimes. The record in this case includes reports and/or testimony from fourteen psychiatrists who examined Steelman at various times after the Sandberg crimes. At his trial, there was contradictory evidence as to whether he had understood the nature of his criminal acts and had appreciated their wrongfulness, as required by the M'Naghten test, see *State v. Doss*, 116 Ariz. 156, 568 P.2d 1054 (1977); *State v. Richmond*, supra. The jury resolved the issue against him. At his first sentencing, the court found no mitigating circumstances and entered a negative finding as to A.R.S. § 13–454(F)(1). After hearing more evidence on the same issue at resentencing, the judge found "no mitigating circumstances sufficiently substantial to call for leniency."

Steelman asserts that he has shown the mitigating circumstance set forth in A.R.S. § 13–454(F)(1):

"1. His capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

We concur with the defendant.

Nine psychiatrists agreed that, in November of 1973, Steelman was suffering from severe mental illness, which most describe as paranoid schizophrenia. Seven of these doctors believed that he was M'Naghten sane at the time of the Sandberg crimes, but that his capacity to conform his conduct to the law was severely impaired by his delusional thinking, especially by his strong tendency to transform others into enemies who deserved to be destroyed. One doctor believed Steelman was M'Naghten insane. The ninth, Dr. Patricia White, who first saw Steelman a week after his arrest, and who gave him at least thirty hours of psychiatric treatment, believed he was probably M'Naghten insane, but scrupulously refrained from enlarging this probability into a reasonable medical certainty.

Only three psychiatrists stated without qualification that Steelman was a sociopath. Two of them saw Steelman for about one hour some five months after his arrest, while he was taking antipsychotic drugs prescribed by Doctor White. Testimony at trial indicated that these drugs would mask psychotic symptoms. Doctor Robert Austin stated at trial that Steelman was a sociopath, but admitted on cross-examination that in a written report he had indicated the presence of "mental illness impairing mental process to a disabling degree."

The strong psychiatric testimony of impairment is corroborated by Steelman's own statements after his arrest and at trial, by testimony of his mother about mental disturbance displayed by Steelman from early adolescence on, by his ex-wife's account of their marriage, and by records of time spent in two California mental institutions (Stockton State Hospital and Vacaville, for the criminally insane).

Considering all this evidence, we believe that at the time Steelman participated in the Sandberg murders his capacity to conform his conduct to the law was significantly impaired as defined in A.R.S. § 13–454(F)(1). We agree with the sentencing court, however, that no mitigation "sufficiently substantial to call for leniency" was established by the defense.

Although this mitigating factor exists, it does not counterbalance the aggravating factors discussed above. Reviewing the record and making an independent determination of the aggravating and mitigating circumstances and weighing them against each other, we do not find this one mitigating factor "sufficiently substantial to call for leniency." Steelman killed four adults, three teenagers and two young children after murdering Michael and Patricia Sandberg. His psychological impairment cannot weigh equally with the damage he has inflicted upon society. We therefore approve the sentences imposed below.

Affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and GORDON, JJ., concur.