612 P.2d 491

**STATE of Arizona, Appellee,**

v.

**Jose Jesus CEJA, Appellant.**

**No 3102–2.**

Supreme Court of Arizona,
En Banc.

May 19, 1980.

Bruce E. Babbitt, Former Atty. Gen., Robert K. Corbin, Atty. Gen. by William J. Schafer III, R. Wayne Ford and Crane McClennen, Asst. Attys. Gen., Phoenix, for appellee.

Brice E. Buehler, Phoenix, for appellant.

HAYS, Justice.

The tortuous path of this case reflects a state of confusion and sometimes inexplicable results reached in the courts, both state and federal, in Arizona and in the nation. The case is before us for the third time after two trials, three sentencings, three aggravation/mitigation hearings, and a sojourn or two in the federal arena. At the last sentencing, as at the previous two sentencings, the death penalty was imposed. This appeal does not concern itself with the judgment of conviction, but attacks the validity of the sentence alone.

Previously, on May 16, 1977, in *State v. Ceja*, 115 Ariz. 413, 565 P.2d 1274 (1977), we affirmed the conviction and the death penalty imposed by the trial court pursuant to statute. Some time later, the United States Supreme Court issued an opinion in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which resulted in an opinion from this court styled, *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978). After *Watson*, we then remanded the current death penalty cases to the trial courts for resentencing under the standards enunciated in that case.

An extensive mitigation hearing was held in this case with numerous witnesses testifying. Two psychologists were appointed to conduct tests on the defendant to determine if there was evidence of organic brain damage to the defendant as a result of alleged paint sniffing and drug abuse. On July 17, 1979, sentence was imposed and this appeal followed.

The trial court, as required by statute A.R.S. §§ 13–453 and 13–454, rendered its special verdict as to aggravation and mitigation. In part, the findings read:

"In the death of Linda Leon, the Court finds from the evidence at trial that the defendant, by himself, went to the Leon home on Sunday, June 30th, 1974, and found decedent Linda Leon home alone. The Court further finds that the defendant went to the home for the express purpose of stealing a large shipment of marijuana in the Leons' possession and that he took a suitcase and a weapon to accomplish this purpose.

"After entering the house, the Court finds that the defendant, who weighed in excess of 200 pounds, shot Linda, who weighed 99 pounds, in the living room. The Court further finds that the defendant thereafter dragged Linda Leon to the bedroom and thereafter fired at least four more shots to the head at close range using a pillow to muffle the sounds. The Court further finds that Linda was shot seven times and that the nature and location of the wounds, the location where the shots were fired, and the manner and means by which the mortal wounds were inflicted conclusively demonstrate that her death was accomplished in a depraved, cruel, and heinous manner.

"In the death of Randy Leon, the Court finds that the defendant after deciding to cap or kill Randy shot him four times. The Court finds that two of the four shots were fired at extreme close range and one of those two shots, the wound with its entrance in the upper back, was directed after the decedent had already fallen to the floor with mortal wounds.

"The Court further finds from the statement by the defendant to Detective Ysasi and from the Medical Examiner's testimony that the defendant kicked Randy in the area of his face after the shooting. The Court further finds that the defendant, in order to delay discovery of the two victims and to prevent any possible aid to them and to assist in his own escape, removed the receiver from the phone and turned the television on to create an appearance that the decedents were in the home using the phone and watching television.

"Based upon the manner and means by which the mortal and other wounds were inflicted, it is the Court's belief that the facts surrounding the death of Randy Leon conclusively demonstrate that his death was accomplished in a depraved, cruel, and heinous manner. I would add to that, that the Court is convinced, as Mr. Buehler has pointed out, that the kicks to the body of Randy Leon were inflicted after Mr. Leon had either lost consciousness or was dead; and it was my conviction he was already dead when he was kicked.

"The Court has carefully weighed and considered the evidence submitted in both the prior and present mitigation hearings. The Court has further examined the psychiatric and psychological reports submitted to this court. The Court has considered the defendant's testimony of May 18, 1976, in this courtroom and his earlier mitigation testimony before Judge Rose. The Court has carefully considered all mitigation evidence in conformity with the guidelines set forth in *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253, a 1978 decision; the Supreme Court decision of *Lockett v. Ohio* and the decision in *Richmond v. Cardwell* and *Ceja v. Cardwell*, 450 F.Supp. 519, (D.C. Ariz.), the decision of Judge Muecke. In all areas the Court has carefully weighed the testimony, statements, and opinions of family, friends, counsellors, clergy, experts, and all others on behalf of the defendant as they affect those issues relating to mitigation.

"As to mitigation, it is the Court's special verdict that: One, the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was not significantly impaired and was clearly not so impaired as to constitute a defense to prosecution.

"On this issue there was evidence that the defendant had experimented with drugs prior to the commission of this offense. In addition, there was evidence that he had sniffed paint prior to June 30, 1974, and possibly on June 30, 1974.

"There is insufficient evidence to believe that the defendant was under the influence of drugs or paint or that these substances diminished or impaired the defendant's mental processes in the killing of the Leons. It should be noted that the defendant himself has never even claimed any such diminution nor has any of the battery of psychiatrists and psychologists who have examined him over the past five years.

"Two, the defendant was not under unusual and substantial duress at the time of the commission of these crimes.

"Defendant has introduced evidence showing that several months before the killing of the Leons the defendant's wife had miscarried and that he had grieved over the loss of this baby. There was further evidence that the baby may have been malformed and that the mother had been a drug user. There is no evidence to show that the miscarriage in March had any connection with or causal relationship whatsoever with the killing of the Leons in June.

"Three, the defendant was not a principal, under 13–452, in the offense which was committed by another. His participation was major and total.

. . . .

"Five, in Judge Muecke's ruling of Richmond v. Cardwell, consideration for the youth of the defendant has been mandated.

"Jose Ceja was born October 24, 1955. He killed Randy and Linda Leon on June 30, 1974. On the date of these offenses, Mr. Ceja was 18 years, 8 months and 6 days old.

"The Court is convinced that youth as a factor of mitigation consists of something more than age. In considering youth, the Court has considered: One, the age of the accused on the date of the crime; two, the degree of planning and preparation, if any; three, the maturity or sophistication of the criminal act; four, the prior juvenile and adult experiences of the accused prior to the date of the crime; five, whether the act was one of impulse or one of deliberation and reasoning.

"The Court finds that Mr. Ceja was a young man with no history of violent criminal behavior prior to June 30, 1974. He was not, however, a stranger to criminal behavior. He had on at least one prior occasion ripped off someone of drugs. He had used and sold a variety of drugs prior to June 30, 1974.

"This double homicide is replete with evidence that the killings, from beginning to end, were not the actions of a panic-stricken, inexperienced, immature youth but rather those of a mature, sophisticated criminal mind.

"The defendant owned a weapon. He was able to move the weapon and his wife's luggage from the premises on or before June 30 without her knowledge. He knew the Leons from prior drug dealings with them. He knew where Randy kept his drugs and weapons.

"The Court finds from the evidence the following facts to be highly significant on the issue of the defendant's youth:

"One, both of the victims were brutally gunned down at different times with repeated close-range shots. There was no panic after Linda's death. There was the cold, deliberate waiting period before Randy returned home.

"Two, Ceja did not panic by leaving the purpose of his mission behind. He had gone to the Leons to rip off the marijuana. Two brutal killings did not cause a panic sufficient to deter him from loading the suitcase with the contraband that he had gone to steal.

"Three, Ceja's actions in turning up the television and taking the telephone off the hook evidence a clever and reasoned mind. Such actions would serve to delay discovery of the bodies by causing people to believe that the Leons were home watching television and/or using the phone.

"Four, removing identification numbers and oiling the murder weapon prior to disposal shows a reasoned and considered action in three respects: (a) by hiding the weapons, Ceja could not be connected by ballistics to the crime; (b) by erasing the serial numbers, the guns could not be traced to Ceja; (c) the oiling would go to preserve

the condition of the weapons for later recovery.

"Five, Ceja'a attendance at his victims' funeral, his help in moving furniture for the Leons after their deaths, and his offer to help police find the killer is [sic] not the actions of an immature and confused youth, but rather a clever, reasoned effort to remove all suspicion from him.

"Six, the disposition of the stolen drugs through use of family and friends again demonstrates to the Court that the macabre deeds of this defendant were not the product of one whose capacity and actions were the product of the defendant's youth.

"The Court has considered all aspects of the defendant's age, character, record, circumstances of life, and circumstances of the crime. The Court has reviewed the evidence from the prior trial, the entire court file, and any and all facts pertaining to this case.

"I might add, Mr. Ceja, that in considering the testimony of your family and friends, this to the Court has been one of the very painful parts of this decision because I have been very impressed with the sincerity, with the love they have shown towards you and for the concern that they have. And I think that their feelings towards you, their love towards you, and the support that they have shown you, I think probably compounds the tragedy because you have had good people who love you and who cared about you.

"In accordance with Arizona Revised Statutes 13–454, the Court concludes that there is one of the aggravating circumstances enumerated in subsection E of A.R.S. 14–453, and that there are no mitigating circumstances sufficiently substantial to call for leniency."

The facts are substantially the same as those set forth in *State v. Ceja, supra.* The mitigation hearing, in addition to considerable questioning of witnesses regarding paint-sniffing and drug abuse by defendant, revealed new facts concerning a marihuana "rip-off" by defendant prior to the killings, and hearsay testimony that defendant had bragged that he was going to "rub out a dude" and rip him off.

The first issue with which we are concerned is the one statutory item of aggravation which was found by the trial judge: Did the defendant commit the offense "in an especially heinous, cruel or depraved manner"? A.R.S. § 13–454(E)(6). Counsel for the defendant, being fully aware that in *State v. Ceja, supra,* we determined that these killings were committed in an especially cruel, heinous and depraved manner, urges us to re-examine the facts. It is certainly incumbent upon us to do so, for we said in *State v. Ceja, supra,* that we have a duty to make an independent examination of the record to determine whether the death penalty was properly imposed. In a sense we have a new record, although in the main the new portion of the record deals principally with mitigation. We have examined the entire record pertaining to aggravation and find that the evidence supports the special verdict of the trial court.

At the outset we indicate that the evidence is inconclusive as to whether the victims suffered in such a way as to support a finding that the crime was committed in a cruel manner. This fact is not of itself determinative for if the crime was committed in an especially heinous, cruel, or depraved manner, either all or one, an aggravating circumstance is present.

The aspect of cruelty involves the pain and the mental and physical distress visited upon the victims. Heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions. In *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977), we set forth the dictionary definitions of each of the words, heinous, cruel and depraved. As to the words heinous and depraved, we find that the actions of the defendant fit those definitions.

[3] Counsel for defendant would have us examine each aspect of these killings as separate and apart, but it is in the totality of the circumstances of both killings that we find the actions of the defendant to

reflect a "shockingly evil" state of mind "marked by debasement." Counsel further would have us infer that the kicks to the head and face of Randy Leon were a light poke to ascertain if the victim was dead. Such an inference is not warranted by reason of the physical evidence to the contrary. Our evaluation of the evidence is the same as when we said in the previous appeal, *State v. Ceja, supra* :

> "In short, it was this additional violence, over and above that which was necessary to carry out the defendant's criminal intent, that in effect distinguishes the murders there from 'the usual or the norm' of first degree murders. *State v. Knapp, supra.*

> "That particular 'additional' element we also find to be present here. The appellant, in attempting to 'rip-off' the Leons, initially shot Linda twice in the chest. At that point, however, he dragged her into another room and shot her four more times in the head, for no apparent reason. Then later, after Randy had been shot and had fallen to the floor, the appellant shot him in the back and kicked him in the face repeatedly, again for no apparent reason. We think that defendant's conduct in continuing his barrage of violence, inflicting wounds and abusing his victims, beyond the point necessary to fulfill his plan to steal, beyond even the point necessary to kill, is such an *additional circumstance of a cruel and depraved nature* so as to set it apart from the 'usual or the norm.'" 115 Ariz. 413, 417, 565 P.2d 1274, 1278.

Although we have removed the aspect of cruelty from our findings, the evidence supports a finding of heinous and depraved.

■ We now turn to the mitigation aspects of the hearing. Defendant's counsel, during the parade of witnesses, brought forth evidence that the defendant was a marihuana user and for a number of years had sniffed paint. Toward the end of the hearing, he elicited testimony from an eminently qualified psychologist as to the possible effects of paint-sniffing. Counsel then asked the court to appoint two psychologists to test the defendant to determine if there had been brain damage. Both experts reported to court and counsel concluding there was no brain damage. In the final paragraph in his report, Dr. Enos, who was the psychologist who testified initially, said:

> "As a matter of fact this is a very bright, intelligent, alert individual who seems to be in possession of all his faculties and not bothered by problems of depression, anxiety or subjective discomfort of any kind. He is well aware of his situation but nevertheless appears to be making a relatively good adjustment to the total situation."

This is not the slow, dull, brain-damaged individual with significantly impaired mental capacity which counsel sought to depict in the mitigation hearing.

We have examined the record and find no mitigating circumstances which would indicate the inappropriateness of the imposition of the death penalty.

Under "Argument II" of his brief, defendant's counsel sets forth the following:

> "II. THE RIGHTS, GUARANTIES AND PROCEDURES ENUMERATED IN THE UNITED STATES CONSTITUTION AND COMMON LAW BAR THE REIMPOSITION OF THE DEATH PENALTY AFTER ITS HAVING BEEN IMPOSED UNDER A STATUTE HELD TO BE UNCONSTITUTIONAL."

In the brief, this broad, general assertion is then broken down into some five subissues. We have examined the issues, which are well presented, but we find these contentions have been previously disposed of by this court. *See State v. Steelman*, 125 Ariz. 19, 612 P.2d 475 (1980); *State v. Mata*, 125 Ariz. 236, 609 P.2d 48 (1980); *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978); *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977).

Special verdict and sentence of death affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and CAMERON and GORDON, JJ., concur.