617 P.2d 1129

The STATE of Arizona, Appellee,

v.

Lewis Stevenson McDANIEL, Appellant.

No. 4220.

Supreme Court of Arizona,
In Banc.

Sept. 11, 1980.

Rehearing Denied Oct. 15, 1980.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Crane McClennen, Asst. Attys. Gen., Phoenix, for appellee.

Kemper & Henze by James Hamilton Kemper, Phoenix, for appellant.

Lewis Stevenson McDaniel, in pro per.

CAMERON, Justice.

This is an appeal from a judgment of guilt of murder in violation of A.R.S. §§ 13–451,[1] –452, –453, –454, –138, –139, and –140; robbery in violation of A.R.S. §§ 13–641 and –643, as amended 1967 and 1975, and §§ 13–138, –139, and –140; and kidnap in violation of A.R.S. §§ 13–491, –138, –139, and –140; and sentences of death for the murder; not less than twenty nor more than life imprisonment for the robbery; and not less than nine nor more than ten years imprisonment for the kidnapping, all sentences to run concurrently. We have jurisdiction pursuant to A.R.S. §§ 13–4031 and –4035.

Numerous issues were raised on appeal, both by defense counsel and the defendant himself. We need deal with only two of these:

1. Was defendant's right to cross–examine accomplices unduly restrained?

2. Did a successor judge have the power to sentence the defendant?

The facts necessary for a disposition of this appeal are as follows. After getting off work early on the morning of 4 August 1975, Arthur Kaehler drove to East Van Buren Street where he picked up a young prostitute named Alice Watkins. When Kaehler asked her to have sex with him, she declined, but she agreed to let him take her home to her apartment in South Phoenix.

1. Title 13 citations in this opinion are to the Arizona Criminal Code as it existed prior to its extensive revision effective 1 October 1978.

Seven people lived at the apartment from time to time: Alice Watkins; McDaniel, her boyfriend, and the defendant in this matter; Theresa Hill, also a prostitute; Mark Rich, Theresa's boyfriend; Cathy Gaines, Alice Watkins' sister; and Alice Watkins' two small children.

When Kaehler and Alice arrived at the apartment, Alice agreed to go inside and ask Theresa if she wished to have sex with Kaehler. Kaehler followed her inside, and after a period of drinking and dancing with Alice, Theresa and Cathy, Kaehler went into a bedroom with Theresa, presumably to have sex.

While Kaehler and Theresa were in the bedroom, defendant and Mark Rich returned to the apartment. They went outside the apartment and observed Kaehler and Theresa through the bedroom window, and then returned to the apartment. Mark then entered the bedroom, demanding to know what Kaehler was doing with his wife (although Theresa was not in fact his wife). The defendant also entered the room and both men began hitting and kicking Kaehler. The evidence was unclear as to who did what, but it is clear that Kaehler was tied up and liquor was poured down his throat. His wallet, watch and ring were taken from him. Alice testified that defendant decided to take Kaehler somewhere and leave him where he would be found. Kaehler, gagged and wrapped in a blanket, was imprisoned in the trunk of his own car. Mark, Alice, and Theresa drove the car to an apartment near 40th Street in South Phoenix, parked, and left the vehicle with windows open, keys in the ignition, and Kaehler still in the trunk. There was testimony at trial that during the drive Kaehler was alive and screaming "let me out." Defendant followed in his own car, picked up the other three, and they all returned to the apartment. Kaehler died of heat exhaustion or suffocation in the extreme heat of the trunk. His body was found three days later.

All five of the adults living in the apartment were arrested. Alice and Theresa pled guilty to manslaughter and were incarcerated in the Arizona State Prison. Mark, still a juvenile, was processed through the juvenile corrections system. Cathy was granted immunity in exchange for her testimony.

Defendant was charged with robbery, kidnapping and murder, and trial began on 16 August 1976. A jury found McDaniel guilty of all three counts, but a motion for new trial was granted on the basis of juror misconduct. The defendant waived a jury in his second trial, and the case was tried to the court. Trial began on 13 June 1977, and, on 7 July 1977, the court found defendant guilty of all three counts. On 18 July 1977, the court held an aggravation–mitigation hearing as required by A.R.S. § 13–454(B). Before sentencing, however, defendant filed a motion to disqualify the trial judge on the basis of bias and prejudice. This motion was heard by visiting Judge T. J. Mahoney and was granted. Judge Frederic Heineman was assigned as trial judge. Defendant's motion for new trial was denied, additional testimony received in regard to aggravation and mitigation, and the defendant was sentenced to death. Defendant was later resentenced pursuant to *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), cert. den. 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979), and the death sentence was imposed. From these convictions and sentences, defendant timely appeals.

## CROSS–EXAMINATION

In a supplementary appellate brief he filed pro se, McDaniel argues that the trial court erroneously limited cross–examination so as to prevent the defense from eliciting testimony tending to show that Mark Rich had reasons for not telling the whole truth at trial. Specifically, the defense was precluded from asking Mark Rich about the terms of the juvenile disposition of charges against him arising from the Kaehler death.

There is evidence suggesting that Rich instigated the harassing of Kaehler and that he was as involved as McDaniel in the events leading to Kaehler's death. The

charges against Rich were disposed of in juvenile proceedings. The record is unclear as to his sentence; he was apparently incarcerated at the Adobe Mountain juvenile facility for something under three years.

At trial, the defense tried to elicit from Rich facts concerning the disposition of charges filed against him in the Kaehler crimes:

"Q  Now, do you know what the situation is about how long you can be held out at Adobe Mountain under the terms of your juvenile commitment?

"MR. SULLIVAN: Objection, irrelevant and immaterial.

"THE COURT: Sustained.

"MR. HAMBURGER: May I be heard?

"THE COURT: No.

"MR. HAMBURGER: May I make a statement for the record?

"THE COURT: You may make a statement on the record out of the presence of the witness. I may let you make your statement later, Mr. Hamburger.

"Q  BY MR. HAMBURGER: Do you presently have a charge pending against you as an adult?

"MR. SULLIVAN: Objection, irrelevant and immaterial.

"THE COURT: Overruled.

"Q  BY MR. HAMBURGER: Answer the question.

"A  Yes.

"Q  Will you tell the Court what that charge is?

"THE COURT: He doesn't have to tell the Court, the case is in this Court. I will let the record reflect that the case is presently in this Division."

In its offer of proof, the defense indicated that it intended to show that, because of felony charges pending against him as an adult, Rich would be reluctant to testify honestly about the Kaehler crimes. In addition, the defense believed it could show that Rich's testimony would affect the date of his release from juvenile custody. Because of the trial judge's decision not to allow inquiry into the juvenile disposition and because of his noting that the case against Rich was pending in his court, rather than allowing testimony concerning the case, the record here is bare of facts concerning Rich's legal status. We do not know what charges were originally filed against him, what charges led to his incarceration at Adobe Mountain, what were the terms and duration of his detention as a juvenile, and what charges were held open against him in the Superior Court. What was in the mind of the trial judge as the result of another case is not part of this record.

We believe that the trial court's decision to preclude inquiry into these matters was error. Specifically, we find that McDaniel's Sixth Amendment right to confront a witness against him was abridged. See *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *State v. Gretzler*, 126 Ariz. 60, 612 P.2d 1023 (1980); *State v. Dunlap*, 125 Ariz. 104, 608 P.2d 41 (1980). We have held that

"great latitude should be allowed in the cross–examination of an accomplice or co–defendant who has turned State's evidence and testifies on behalf of the State on a trial of his co–defendant. * * * "While it is true that the extent of such cross–examination is within the sound discretion of the trial judge; nevertheless, if the trial judge has excluded testimony which would clearly show bias, interest, favor, hostility, prejudice, promise or hope of reward, it is error and will be ground for a new trial. (citations omitted)." *State v. Holden*, 88 Ariz. 43, 54–55, 352 P.2d 705, 713–14 (1960).

In *State v. Morales*, 120 Ariz. 517, 587 P.2d 236 (1978), a case similar to McDaniel's but before a jury, we reversed because the trial court foreclosed defense inquiry into the penalties faced by a juvenile accomplice if he were to be tried as an adult. We held that the trier must not be prevented from learning what this major witness expected in return for his testimony. It is arguable that in a bench trial, where the trier is sophisticated about plea bargaining, he will automatically weigh the legal pressure on

accomplice–witnesses in evaluating their credibility. We are, however, reluctant to hinge such a fundamental right on such an assumption. This is particularly true when, as here, the trial court's limitation of cross–examination results in a record that may conceal the extent of prejudice to the defendant in not being able to adequately and completely cross–examine this important witness. We find that

> "[t]he trial court's refusal to allow inquiry into the penalty the witness would have faced had he not agreed to testify was reversible error." *State v. Morales*, supra, 120 Ariz. at 520, 587 P.2d at 239.

### MOTION FOR NEW TRIAL

■ After a bench trial and a determination of guilt, the defense moved for a change of judge for cause and a new trial. A hearing was held before Judge T. J. Mahoney who granted defendant's motion for change of judge, but left the motion for new trial to the newly assigned judge, Judge Heineman. Judge Heineman denied the defendant's motion for new trial and sentenced the defendant to death.

In Arizona capital cases, the power of a successor judge is severely limited by the terms of our death penalty statute, A.R.S. § 13–703, formerly § 13–454. Subsection B of A.R.S. § 13–703 reads:

> "B. When a defendant is found guilty of or pleads guilty to first degree murder as defined in § 13–1105, *the judge who presided at the trial or before whom the guilty plea was entered* shall conduct a separate sentencing hearing to determine the existence or nonexistence of the circumstances included in subsections F and G of this section, for the purpose of determining the sentence to be imposed. The hearing shall be conducted before the court alone." (emphasis added)

The statute is unambiguous in this requirement that the judge who heard the trial or accepted the plea preside at the aggravation–mitigation hearing and, by inference, impose the sentence. In the present case, the previous judge tried the case, found the defendant guilty, and held the aggrava-

tion–mitigation hearing before his removal. Judge Heineman heard further arguments at the sentencing hearing, reviewed the transcripts of the aggravation–mitigation hearing, and then sentenced the defendant.

While we have little legislative history regarding this statute, it is reasonable to assume from the unambiguous requirement in subsection B of the statute, that the drafters considered it important that the judge who held the aggravation–mitigation hearing be the same judge who had heard the testimony and evidence against the defendant at trial. We believe that the statute requires the hearing, the special verdict, and the sentencing to be carried out by the same judge who presided at the trial or accepted the plea.

Reversed and remanded for new trial.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and GORDON, JJ., concur.