666 P.2d 57

**STATE of Arizona, Appellee,**

v.

**Willie Lee RICHMOND, Appellant.**

**No. 2914.**

Supreme Court of Arizona,
En Banc.

May 12, 1983.

Rehearing Denied June 28, 1983.

315

Robert K. Corbin, Atty. Gen. by William J. Schafer III, and Jack Roberts, Asst. Atty. Gen., Phoenix, for appellee.

Richard S. Oseran, Former Pima County Public Defender, Frederic J. Dardis, Pima County Public Defender by Allen G. Minker, Tucson, for appellant.

HOLOHAN, Chief Justice.

Appellant, Willie Lee Richmond, was found guilty of first degree murder on February 5, 1974, and was sentenced to death. This court affirmed the conviction and the sentence in *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977). However, we later vacated the death sentence pursuant to *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979), and remanded for resentencing.

After a sentencing hearing, appellant again was sentenced to death, from which sentence he now appeals. Additionally, appellant asks that we review the denial of his petition for post-conviction relief. We have jurisdiction pursuant to A.R.S. § 13–4031 and Rule 32.9, Arizona Rules of Criminal Procedure, 17 A.R.S.

The conviction arose from a 1973 incident where appellant and his 15-year-old girlfriend, Faith Erwin, accompanied Becky Corella and Bernard Crummett to a Tucson motel. Becky had arranged to perform an act of prostitution with Crummett. Becky informed appellant that Crummett was "loaded." Appellant decided to rob Crummett.

Appellant accompanied by the two women and Crummett drove to a deserted area outside Tucson ostensibly for Crummett to engage in another act of prostitution with Becky. Appellant stopped the car feigning a flat tire. Appellant alighted from the car and went to the passenger side where he pulled Crummett from the car. Appellant knocked Crummett to the ground, and, as Crummett lay on the ground, appellant hit him with several large rocks, causing Crummett to lose consciousness. Becky took the victim's watch and wallet from his pockets. Appellant and the two women left Crummett lying unconscious on the ground, but, before leaving, the vehicle was twice driven over him.

Medical testimony revealed that Crummett died of a compressive injury to the skull consistent with the excessive force of a wheel of a car. At trial Faith Erwin testified that appellant was the driver of the automobile when it was driven over the victim. Appellant claimed that Becky Corella was the driver.

NOTICE

Appellant claims a violation of his sixth amendment right to know the nature and cause of the accusation against him because the information did not put him on notice that he could receive the death penalty, nor did it state what aggravating factors would be presented. Appellant did not raise this issue at the time he appealed his conviction, but, as we are required, pursuant to A.R.S. § 13–4035, to search the record for fundamental error, we will address this issue. Appellant was charged with first degree murder in violation of A.R.S. § 13–451, § 13–452 and § 13–453.[1] At that time § 13–453 provided that "a person

1. These are section numbers under the old criminal code, they have since been renumbered or repealed.

guilty of murder in the first degree shall suffer death or imprisonment in the state prison for life." In *State v. Blazak*, 131 Ariz. 598, 643 P.2d 694 (1982), we addressed the issue raised by appellant, and we held that an indictment charging first degree murder was sufficient on its face to inform the defendant of the crimes charged and the sentences which could be imposed. Due process requires that a defendant be advised of the specific charges against him. The information in this case gave appellant adequate notice of the charges. There is no requirement that a defendant be advised in the indictment or information of the statutory penalty, or that he be advised what aggravating circumstances will be presented at sentencing in the event of a conviction.

## SPEEDY TRIAL

█ Appellant was first sentenced to death in February of 1974. He was resentenced to death in 1980. Now appellant claims he was denied his right to a fair and speedy sentencing, and that he was prejudiced by the six-year gap which deprived him of the ability to effectively present his case for mitigation. We addressed this issue in *State v. Blazak, supra*, where we stated, "[n]either this court nor the United States Supreme Court has found that the right to a speedy trial extends to sentencing." 131 Ariz. at 600, 643 P.2d at 696, citing *State v. Steelman*, 126 Ariz. 19, 612 P.2d 475 (1980).

█ The delay resulted in the appellant having an opportunity to present additional evidence as mitigation. Additionally appellant has failed to show how he was prejudiced. He was afforded the opportunity to present his original mitigating evidence as well as any additional mitigating factors which may have been omitted in the first sentencing hearing or which have arisen since that hearing. The sentence he received at his resentencing was no harsher than the original sentence. We are unable to find any prejudice resulting from the delay.

## RESENTENCING UNDER WATSON

█ On numerous occasions this court has heard and rejected arguments that resentencing under *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979) is unconstitutional. Appellant asserts several grounds for this argument claiming the resentencing is: (1) a violation of ex post facto prohibitions; (2) a violation of double jeopardy prohibitions; and (3) a violation of the due process and separation of powers requirements because it is a judicially created penalty. We have addressed these issues many times before with resolutions adverse to appellant. *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983); *State v. Blazak*, 131 Ariz. 598, 643 P.2d 694 (1982); *State v. Jordan*, 126 Ariz. 283, 614 P.2d 825, *cert. denied*, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). These arguments have also been considered and rejected by the Ninth Circuit Court of Appeals in *Knapp v. Cardwell*, 667 F.2d 1253, *cert. denied*, —— U.S. ——, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982).

## SENTENCING CHALLENGES

█ The sentencing procedure is contested by appellant on three other grounds. First, that he was denied his alleged constitutional right to have a jury decide the presence of aggravating or mitigating circumstances. We have previously rejected this argument. *State v. Gretzler, supra; State v. Blazak, supra; State v. Watson, supra.* Second, appellant contends it is unconstitutional to place the burden of proof of mitigating circumstances on the defendant. Once the defendant has been found guilty beyond a reasonable doubt, due process is not offended by requiring the defendant to establish mitigating circumstances. As we stated in *State v. Smith*, 125 Ariz. 412, 416, 610 P.2d 46, 50 (1980), "[f]acts which would tend to show mitigation are peculiarly within the knowledge of a defendant."

Third, appellant claims he was denied his right to be sentenced by an impartial trier of fact. This contention is based on evi-

dence which was introduced at the original sentencing. At the first sentencing hearing, defense counsel presented psychiatric testimony which classified appellant as a sociopath or psychopath. This condition was described as one who never learns from experience, has poor impulse control, has a lack of moral insight and shows very little guilt. The psychiatrists characterized appellant as callous, grossly selfish, irresponsible and impulsive. This testimony was introduced as mitigation.

Under the Arizona death penalty statute in effect at the time, the judge could consider *only* four enumerated factors as mitigation. One of the statutory mitigating circumstances was that "the defendant's capacity to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."[2] The psychiatric testimony was intended to show the existence of this particular mitigating factor. The judge did not find this factor to exist.

Five years later, when this court ordered a resentencing, the case was returned to the original trial judge. Appellant's request for a change of judge was denied by the presiding judge.[3] At the time of the resentencing, the Arizona death penalty statute, A.R.S. § 13–703, required that the judge who heard the case also conduct the sentencing. *State v. McDaniel,* 127 Ariz. 13, 617 P.2d 1129 (1980). The statute has recently been amended to allow a judge other than the trial judge to conduct the sentencing hearing if the trial judge has died, resigned, or become incapacitated or disqualified.

■■■ A litigant is entitled to an impartial judge at any stage of the proceedings. *See, State v. Barnes,* 118 Ariz. 200, 575 P.2d 830 (App.1978). However this does not include a judge totally ignorant of the previous proceedings. Any judge who might have conducted the resentencing in this case would have before him the record of

the trial and the original sentencing hearing. Appellant presents no evidence that the sentencing judge entertained actual bias or prejudice against him. We stated in *State v. Greenawalt,* 128 Ariz. 150, 168, 624 P.2d 828, 846 *cert. denied,* 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981), "evidence is not inadmissible simply because it paints a black picture of the defendant's character or his bent for evil." Without some specific showing of bias on the part of the sentencing judge, we cannot say appellant was prejudiced or deprived of due process. From time to time appellate courts send cases back to a trial court for resentencing. The fact of resentencing is not sufficient, standing alone, to infer bias or prejudice.

The psychiatric evidence of the first mitigation hearing was not used in the second hearing, and there was no reference to that evidence in the second hearing.

■■■ Additionally, in each case where the death penalty is imposed, this court conducts an independent review of the record to assure a just result. We have reviewed the record in the instant case, and find no evidence of prejudice exhibited by the sentencing judge.

## FELONY MURDER AND THE DEATH PENALTY

The jury which convicted appellant was instructed on both theories of first degree murder—premeditation and felony murder. The jury returned a verdict of first degree murder. There is no indication in the record whether the jury's verdict was based on premeditation or felony murder.

The appellant contends that under the state of the record in this case the penalty of death cannot be imposed. The United States Supreme Court recently discussed the issue of felony murder in *Enmund v. Florida,* —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The Court observed:

---

**2.** Former A.R.S. § 13–454(F)(1), renumbered as A.R.S. § 13–703(G)(1).

**3.** The motion was denied because it was not timely made. We will, however, examine this contention for fundamental error.

Enmund himself did not kill or attempt to kill; and as construed by the Florida Supreme Court, the record before us does not warrant a finding that Enmund had any intention of participating in or facilitating a murder. Yet under Florida law death was an authorized penalty because Enmund aided and abetted a robbery in the course of which a murder was committed.

Id. at ——, 102 S.Ct. at 3377, 73 L.Ed.2d at 1152. The Court concluded that death was not a valid penalty for one who neither took life, attempted to take life, nor intended to take life.

■ By comparison, in the instant case appellant was an active participant. Appellant admitted he planned the robbery, drove the victim into the desert and knocked the victim unconscious to rob him. Faith Erwin testified that appellant threw rocks at the victim after he knocked him to the ground. Bloody rocks were found at the scene. The medical examiner testified that there were two kinds of force applied to the victim's skull—one which was consistent with the automobile tire and another in which there was external application of a pointed object. There is, however, no evidence that the latter force alone would have killed the victim.

Even if we accept appellant's contention that he was not driving the car when the victim was run over, we do not believe this case falls within the parameters of *Enmund.* The facts from the appellant's version indicate that he was the leader of the group; he was the first to use violent force on the victim; he was aware that the victim, if allowed to live, could identify him. Appellant, from his version of the facts, was willing to leave the wounded and unconscious victim alone in the desert to an uncertain fate. Appellant contends that Becky Corella was the one who drove the car over the victim. There is no evidence that appellant protested or showed any emotion when the victim was twice run over. The appellant's version of the facts indicates appellant played an integral part in the events which caused the victim's death, and he willingly assisted in the acts which were intended to cause the victim's death.

The evidence presented by the state was that the appellant drove the vehicle over the victim, thus killing him. The testimony of Faith Erwin was that the appellant was the driver at the time the victim was run over. The circumstantial evidence supports Faith's testimony. The circumstances show that appellant was the driver when the group left for the desert. The other woman, Becky Corrella, was so short in stature that it was difficult for her to operate an automobile. Appellant was the leader of the group and directed the operation. With such support we believe the trial judge was justified in concluding that appellant drove the vehicle that was used to kill the victim.

Under either version of the facts appellant does not fit within the sphere of defendants the *Enmund* court seeks to protect from capital considerations. The evidence in this case shows that appellant intended to take a life.

## PRIOR CONVICTION

Appellant was convicted in the instant case on February 5, 1974. He was convicted of another murder on August 9, 1974, even though that murder had occurred before the murder in the instant case. At the resentencing in 1980 the State sought to use this later conviction as an aggravating factor. Appellant argues this was improper.

A.R.S. § 13–703(F) enumerates aggravating circumstances which should be considered in determining the imposition of the death penalty. A.R.S. § 13–703(F)(1) states that "the defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable." Citing *State v. Ortiz,* 131 Ariz. 195, 639 P.2d 1020 (1981), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982), appellant contends the trial court erred in finding this aggravating circumstance.

In *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983), this court stated:

Convictions entered prior to a sentencing hearing may thus be considered regardless of the order in which the underlying crimes occurred, *State v. Jordan,* [*supra,*] or the order in which the convictions were entered. [*State v. Valencia,* 124 Ariz. at 139, 602 P.2d at 807, 809 (1979)].

Any language suggesting the contrary in *State v. Ortiz, supra,* [131 Ariz. at 210–11, 639 P.2d at 1035–36] is hereby disapproved. In *Ortiz,* we found the trial court erred in considering a contemporaneous conviction for conspiracy to commit murder as aggravation for the murder. This exclusion from consideration is best understood as having been required because both convictions arose out of the same set of events.

135 Ariz. at 57, n. 2, 659 P.2d at 16, n. 2.

■ In light of the language in *Gretzler,* the trial court did not err in finding the prior murder conviction to be an aggravating circumstance.

### CRUEL AND HEINOUS

■ The trial court found as another aggravating factor that the offense had been committed in an especially cruel and heinous manner pursuant to A.R.S. § 13–703(F)(6) which provides: "The defendant committed the offense in an especially heinous, cruel or depraved manner." Appellant contends this was error.

"Cruel" has been defined as "disposed to inflict pain especially in a wanton, insensate or vindictive manner: sadistic." *State v. Knapp,* 114 Ariz. 531, 543, 562 P.2d 704 (1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). Cruelty involves the victim's pain or suffering before death. *State v. Gretzler, supra; State v. Poland,* 132 Ariz. 269, 645 P.2d 784 (1982); *State v. Lujan,* 124 Ariz. 365, 604 P.2d 629 (1979). The offense must be committed in an *especially* cruel, heinous or depraved manner to be considered an aggravating circumstance. *State v. Lujan, supra.* We do not find the offense to be especially cruel; there is no evidence in the record to indicate the victim suffered more pain than that of the initial blow which rendered him unconscious.

■ "Heinous" has been defined as "hatefully or shockingly evil; grossly bad," and "depraved" is "marked by debasement, corruption, perversion or deterioration." *State v. Knapp, supra.* Heinous and depraved involve the mental state and attitude of the offender as reflected in his words and actions. *State v. Gretzler, supra; State v. Poland, supra; State v. Lujan, supra.* In *Gretzler, supra,* we discussed factors which lead to a finding of heinousness or depravity. One factor is the infliction of gratuitous violence on the victim; another related factor is the needless mutilation of the victim. Here the victim was already unconscious and bleeding when he was run over not once, but twice, each time from a different direction. The evidence indicates that the first run by the vehicle was over the victim's head crushing his skull and killing him. The second run of the vehicle was over the body of the victim. The investigating officers found, at the location of the murder, two large pools of blood separated by about 30 feet, which was consistent with the body having been run over and dragged to where it was found. Again the fact that the victim in the instant case was run over twice and his skull was crushed, we find to be a ghastly mutilation of the victim.

The presence of any one of the three elements—cruel, heinous, or depraved—is sufficient to constitute an aggravating circumstance. *State v. Bishop,* 127 Ariz. 531, 622 P.2d 478 (1980). We believe the facts of this case set it "apart from the normal first degree murders." *State v. Brookover,* 124 Ariz. 38, 601 P.2d 1322 (1979). The trial court was correct in finding the offense was committed in an especially heinous manner. It is also evident that the trial court could have found that the offense was committed in an especially depraved manner.

Appellant argues in the alternative that the "cruel, heinous and depraved" language of Arizona's death penalty statute is unconstitutionally vague and broad. We have addressed this contention in *State v. Gretz-*

ler, supra, and found no constitutional infirmity in the statute.

The trial court judge did not find that "the defendant committed the offense as a consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." A.R.S. § 13–703(F)(5). The trial court judge was under the mistaken belief that this subsection only applied to the "contract" type murder. Appellant was sentenced on March 13, 1980. This was prior to our decision in *State v. Clark*, 126 Ariz. 428, 616 P.2d 888, *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980), where we specifically held that this aggravating circumstance is not limited to the "hired gun" or "contract" type killing. In *Clark* we stated that this subsection applies to any murder committed for financial gain.

The state addressed this issue in its answering brief, but did not raise the issue through a cross-appeal. Thus, we need not reach the issue of the propriety of this court finding an additional aggravating circumstance which was not found by the trial court.

## MITIGATING CIRCUMSTANCES

At the 1980 sentencing hearing appellant presented evidence of his conduct in prison since 1974 when he first went to death row. Testimony was received from members of appellant's family, his friends, and from prison counselors which related appellant's good character, the change in attitude he has undergone and his attempts to better himself. Appellant contends the trial court erred in failing to find his improved conduct and character to be a mitigating circumstance. Appellant cites *State v. Watson (II)*, 129 Ariz. 60, 628 P.2d 943 (1981), where very similar evidence was presented as mitigation. There we held that the evidence could and should be considered a mitigating circumstance. While it would have been an arbitrary decision had the court refused to consider the evidence, it is clear from the record the court *did* consider the evidence but found it unpersuasive.

## INDEPENDENT REVIEW

The sentencing statute, A.R.S. § 13–703, provides that the death penalty shall be imposed if the court finds one or more aggravating circumstances and "there are no mitigating circumstances sufficiently substantial to call for leniency." In death penalty cases, this court will conduct an independent examination of the record to determine for ourselves the presence or absence of aggravating and mitigating circumstances and the weight to give each. We also independently determine the propriety of the sentence. *State v. Gretzler, supra, State v. Blazak, supra.* The trial court correctly found three aggravating circumstances: first, that the defendant has been convicted of an offense (murder) for which life imprisonment or death was imposable, A.R.S. § 13–703(F)(1); second, that the defendant has been convicted of a felony (murder and kidnapping) involving the use or threat of violence, A.R.S. § 13–703(F)(2); third, that the offense was committed in an especially heinous manner, A.R.S. § 13–703(F)(6).

As mitigating factors the court found that both Rebecca Corella and Faith Erwin were involved in the crime but were never charged, that the victim had engaged in an illegal act of prostitution with Rebecca Corella near the time of the offense and had solicited an act of prostitution with Faith Erwin, a minor, near the time of the offense. The court also found that the jury was instructed on the felony murder rule as well as on matters related to premeditated murder. Additionally, the court found appellant's family was supportive of him and would suffer considerable grief as a result of the imposition of the death penalty.

The trial court did consider evidence regarding appellant's change in character, but was unable to make a definitive finding on the matter. In *State v. Watson (II), supra,* we held that evidence revealing a substantial improvement of a defendant's character could be viewed as a mitigating factor. In the case at bench the trial court was not convinced that appellant's charac-

ter had changed. We do not believe this position was unreasonable. The trial court was able to observe appellant at the resentencing hearing and listen to his testimony. The trial court was also aware appellant had been in a very controlled environment while his alleged change of character took place, with much to gain from his good behavior. Additionally the judge had evidence before him of the lifestyle appellant led before his incarceration, including the fact he was involved in another murder. These facts cast sufficient doubt upon appellant's veracity so the trial court could reasonably decline to find the proffered evidence to be a mitigating factor. The court further found that there were no mitigating circumstances sufficiently substantial to call for leniency.

We believe the mitigation offered by appellant is not sufficiently substantial to outweigh the aggravating circumstances. Particularly we note the fact that this is not the first murder which appellant has perpetrated, as well as the gruesome manner in which this murder was committed. The death sentence is appropriate in this case.

## PROPORTIONALITY REVIEW

■ We stated in *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977), that we will conduct a proportionality review to determine "whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Id.,* 114 Ariz. at 196, 560 P.2d at 51. We have considered other cases in which the defendants robbed and murdered their victims and received the death penalty. *State v. Gretzler, supra; State v. Clark, supra; State v. Jordan, supra; State v. Ceja,* 126 Ariz. 35, 612 P.2d 491 (1980); *State v. Evans,* 120 Ariz. 158, 584 P.2d 1149 (1978), *sentence aff'd,* 124 Ariz. 526, 606 P.2d 16, *cert. denied,* 449 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d 119 (1980). We find that the resolution in the instant case is not disproportionate to these cases.

Appellant likens his case to *State v. Watson* (II), 129 Ariz. 60, 628 P.2d 943 (1981), where we set aside the death sentence. Both cases involve a robbery and subsequent murder. Both defendants presented as mitigation evidence of a significant change in their character for the better, and both defendants received harsher sentences than their accomplices. However, the aggravating circumstances are very different in that the offense in *Watson* was not found to be especially heinous and depraved. Moreover, the defendant in *Watson* had only one prior conviction for robbery, while appellant in the instant case has prior convictions for both kidnapping and murder in separate incidents. Additionally, in *Watson* there were other compelling factors in mitigation—the age of the defendant (21) and the fact that the victim was armed and fired the first shot. We believe the differences in the cases are so significant that the different resolutions are necessary.

## CONSTITUTIONAL CHALLENGES

■ Appellant challenges the constitutionality of the Arizona death penalty statute claiming the statute, on its face and in application, is violative of the eighth amendment in that it allows for arbitrary and capricious determinations. We have previously considered and rejected this issue. *State v. Gretzler, supra; State v. Blazak, supra; State v. Richmond, supra.*

■ The death penalty was challenged by appellant in a Rule 32 petition for postconviction relief on the ground that in Arizona this penalty has been imposed in a manner discriminatory against black persons. This post-conviction relief was denied and we granted his petition for review which we consolidated with this appeal. In addition, appellant claims he was denied due process of law when the court refused to hold a hearing on this claim. In a similar argument appellant claims the death penalty has been visited upon poor persons and male persons in disproportionate numbers. We agree with the state's assertion that neither the federal constitution nor this

court has ever required that the imposition of the death penalty precisely reflect the composition of the general population. What the United States Supreme Court has required is guidelines to bridle the discretion of the sentencing authority, thus minimizing the risk of arbitrary imposition of the death penalty. *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

 Before one is subject to the death penalty in Arizona, the state must charge him and prove him guilty beyond a reasonable doubt. Then the state must prove aggravating circumstance(s) beyond a reasonable doubt. *State v. Jordan,* 126 Ariz. 283, 614 P.2d 825 (1980). The trial court may then find mitigating factors substantial enough to call for leniency. This court will then conduct an independent review of all matters of aggravation and mitigation to determine if the death sentence was properly imposed. *State v. Gretzler, supra; State v. Richmond, supra.* In addition, we conduct a proportionality review in every case to assure the penalty is not excessive nor disproportionate to the sentences imposed in similar cases. *State v. Gretzler, supra; State v. Richmond, supra.* These safeguards are blind to the color, wealth or sex of the defendant. We find no merit in appellant's argument.

We do not find it necessary to address appellant's last contention that the death penalty is a violation of international law.

We have examined the entire record for fundamental error, as required by A.R.S. § 13–4035, and find none.

The sentence of death is affirmed.

HAYS, J., concurs.

CAMERON, Justice, specially concurring.

I agree that the death penalty is properly imposed in this case. However, because I disagree with the majority in its holding that the crime was especially heinous and depraved, I feel that I must specially concur.

I do so not because I am insensitive to the tragic consequences of defendant's criminal conduct, but because I believe that if the death penalty statute in Arizona is to pass constitutional muster, it must be interpreted in such a way that only those who clearly come within the mandate of our legislature and the United States Supreme Court are given this punishment. The death penalty is reserved only for those crimes which are above the norm of first degree murders, or for defendants who are above the norm of first degree murderers. *State v. Zaragoza,* 135 Ariz. 63, 68, 659 P.2d 22, 27–28 (1983); *State v. Watson,* 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981).

The majority finds this crime to be especially heinous and depraved under A.R.S. § 13–703(F)(6), based on two of the criteria set out in *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983), the infliction of gratuitous violence on the victim, and the needless mutilation of the victim. I do not believe the facts of this case fit within the proper boundaries of these criteria.

The infliction of gratuitous violence was found and the death penalty imposed in *State v. Ceja,* 126 Ariz. 35, 612 P.2d 491 (1980), in which the defendant continued to shoot his victims after it was apparent they had been fatally wounded, and then began kicking one of the victims in the face repeatedly while the victim was already unconscious or dead. We said,

> We think that defendant's conduct in continuing his barrage of violence, inflicting wounds and abusing his victims, beyond the point necessary to fulfill his plan to steal, beyond even the point necessary to kill, is such an additional circumstance of a * * * depraved nature so as to set it apart from the 'usual or the norm.' 126 Ariz. at 40, 612 P.2d at 496,

quoting *State v. Ceja,* 115 Ariz. 413, 417, 565 P.2d 1274, 1278 (1977). *See also State v. Gretzler,* supra, 135 Ariz. at 52, 659 P.2d at 11.

We similarly held that gratuitous violence was inflicted in *State v. Jeffers,* 135 Ariz. 404, 661 P.2d 1105 (1983), where after the killing the defendant climbed on top of the

corpse and beat its face repeatedly with his fists, resulting in facial wounds and bleeding. In *State v. Woratzeck,* 134 Ariz. 452, 657 P.2d 865 (1982), we also held that gratuitous violence was employed where the defendant strangled, stabbed and bludgeoned the victim to death, and the force used by each of these three methods was sufficient to kill. The death penalty was properly imposed in both *Jeffers* and *Woratzeck.*

In the instant case the victim was killed by being run over by an automobile. The evidence adduced at trial indicates the automobile was likely backed over the victim, and then driven forward over the victim. There is no evidence to suggest that the defendant knew or should have known that the victim was dead after the first pass of the car. *Cf. State v. Gerlaugh,* 134 Ariz. 164, 654 P.2d 800 (1982) (victim still alive after defendant ran over him with his automobile several times). Therefore, unlike the defendants in *Ceja, Jeffers,* and *Woratzeck,* supra, there has been no showing that this defendant inflicted any violence on the victim which he must have known was "beyond the point necessary to kill."

The criterion of mutilation of the victim was demonstrated by *State v. Vickers,* 129 Ariz. 506, 633 P.2d 315 (1981), where the defendant strangled to death his prison cellmate and then carved the word "Bonzai" into the victim's back. Similarly in *State v. Smith,* 131 Ariz. 29, 638 P.2d 696 (1981), after suffocating the female victims the defendant proceeded to mutilate their sex organs and breasts with sharp objects. The death penalty was imposed in these two cases based in part on the finding that the crime was committed in a heinous and depraved manner. The facts of these cases are in marked contrast to the present case. Here there is no suggestion of distinct acts, apart from the killing, specifically performed to mutilate the victim's body. Any disfigurement of the victim in this case was the direct result of the killing itself. I do not believe we should stretch the definition of "mutilation" to cover all murders in which the victim's body is disfigured, where there is no indication of a separate purpose to mutilate the corpse.

It is true, of course, that the appearance of the victim in this case was "ghastly" as the majority states. But as the United States Supreme Court has recently said in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (reversing an application of Georgia's statutory aggravating circumstance of "outrageously or wantonly vile, horrible or inhuman"),

> [I]t is constitutionally irrelevant that the petitioner used a shotgun instead of a rifle as the murder weapon, resulting in a gruesome spectacle in his mother-in-law's trailer. An interpretation of [the aggravating circumstance] so as to include all murders resulting in gruesome scenes would be totally irrational. Id. at 433, n. 16, 100 S.Ct. at 1767, n. 16, 64 L.Ed.2d at 409, n. 16 (plurality opinion). *See also* id. at 435, 100 S.Ct. at 1768, 64 L.Ed.2d at 410–11 (Marshall, Brennan, J.J., concurring) ("[We] also agree that * * * the fact that the murder weapon was one which caused extensive damage to the victim's body is constitutionally irrelevant.")

Our statutory aggravating circumstance of a heinous or depraved killing focuses on the state of mind of the killer, *see State v. Graham,* 135 Ariz. 209, at 212, 660 P.2d 460 at 463; *State v. Jeffers,* supra, 135 Ariz. at 429–430, 661 P.2d at 1130–31; *State v. Zaragoza,* supra, 135 Ariz. at 69–70, 659 P.2d at 28–29; *State v. Gretzler,* supra, 135 Ariz. at 51, 659 P.2d at 10; *State v. Wortazeck,* supra, 134 Ariz. at 457, 657 P.2d at 870, not on the appearance of the corpse. Although the resulting scene was gruesome, I believe the proper application of the criteria discussed above fails to support a finding that the killer acted in a state of mind which was especially heinous or depraved. This crime is therefore not above the norm of first degree murders.

The criminal record of this defendant, however, clearly places him above the norm of first degree murderers. He has been convicted of another first degree murder and a kidnapping, each arising in separate incidents. This history of serious violent

crime justifies the imposition of the death penalty.

I concur in the opinion of the majority except its finding that this crime was heinous and depraved, and I concur in the result.

GORDON, Vice Chief Justice, concurring.

I concur in Justice Cameron's special concurrence.

FELDMAN, Justice, dissenting.

I cannot agree with that portion of the majority decision which holds that the death penalty may now be properly imposed upon the defendant.

I agree with Justice Cameron that the murder was not heinous and depraved. The remaining aggravating circumstances in this case were that defendant had been convicted of an offense for which life imprisonment or death was imposable, A.R.S. § 13–703(F)(1), and that defendant had been convicted of a felony involving the use or threat of violence, *id.* (F)(2). Both of these circumstances pertain to the character of the defendant, defining the type of murderer and serving to set the defendant apart and above the "norm" of killers. As we stated in *State v. Watson* (*Watson II*), 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981):

> [T]he death penalty should be reserved for only the most aggravating of circumstances, circumstances that are so shocking or repugnant that the murder stands out above the norm of first degree murders, *cr the background of the defendant sets him apart from the usual murderer.*

(Emphasis supplied.) As Justice Cameron correctly states, the crime here does not stand out "above the norm of first degree murders"; thus, the imposition of the death penalty in this case is clearly based upon the character of the defendant.

In *Watson II, supra,* we held that rehabilitation evidence could and should be considered a mitigating circumstance. *Id.* at 63–64, 628 P.2d at 946–47. Thus, *Watson II* stands for the proposition that the relevant question in such cases is not limited to defendant's character at the time of the offense, but also includes his character at the time the death penalty is to be carried out.

The majority opinion indicates that the evidence of defendant's improved conduct and character was "very similar" to that presented in *Watson II,* yet concludes that the mitigation evidence offered by defendant was not sufficiently substantial to call for leniency. While defendant's prior murder conviction weighs heavily against him, in my view the rehabilitation evidence "very similar" to that presented in *Watson II* tips the balance strongly in favor of reducing defendant's sentence to life imprisonment.

At the final sentence hearing, twelve individuals offered evidence of defendant's changed character and efforts to rehabilitate himself since his imprisonment in 1974. These witnesses included several members of his family, employees of the Arizona State Prison at Florence, a fellow prisoner on death row, and a local missionary who regularly visited and corresponded with the defendant. The theme which ran through all of the testimony at the sentence hearing was that defendant had changed remarkably since he had arrived at prison six years previously. The witnesses believed that defendant's attitude had improved materially, that he had found a purpose in life and now had a genuine desire to better himself and, more important, to help others. There seemed to be no question but that this desire to help others was more than subjective; it was actually carried into effect.

There were objective facts to support these opinions. Among the objective factors which manifested the change in defendant were the following: Defendant had transformed himself into a literate person, learning to read and write. He had learned to type. Witnesses testified that defendant often read three books a week and exchanged reading materials with other prisoners. Defendant had employed his newfound ability to read, write and type by using his time in prison in a constructive manner, typing numerous letters to family and friends, and studying the Bible. The

counselors employed at the prison testified that defendant provided encouragement, advice and spiritual assistance both to his family and to other prisoners.

Defendant's family noted the difference in his attitude. Defendant had become settled and matured. He was honestly trying to give some meaning to his life. From prison, both in the form of letters and visits from his family, defendant assisted them with their problems, gave them advice and encouraged them. He was truly concerned for his family's welfare. The same was true for his relationship with other prisoners.

The counselors employed by the prison also testified that defendant's attempts to better and rehabilitate himself were genuine. Of course, this is a matter of opinion, but it was uncontradicted and, in light of the experience of the prison counselors, I would place great weight on their assessment.

Finally, the defendant himself testified that if given life imprisonment he understood that he would never live outside prison, because the life sentence would and should be imposed consecutively to the other sentences which he was already serving. Nevertheless, he felt that he had changed and had something worthwhile to offer others in prison society and his family if he were allowed to live. Given the current problems of our prison system, it is certainly necessary that we provide inmates with role models and assistance for rehabilitation, especially when such models are based upon changes in attitude and religious commitment.[1] The record available to us thus leads to an overwhelming conclusion that defendant has made a sincere, successful

and continued effort to change his character, rehabilitate himself and contribute in his own way to society. As the majority indicates, the trial court could not make a "definitive finding" on the question of rehabilitation. While the majority speculates that the trial court was "not convinced" that defendant's character had changed, the fact is that the trial court made no such finding. The majority states that the facts "cast sufficient doubt upon appellant's veracity so the trial court could reasonably decline to find the proffered evidence to be a mitigating factor." Again, the trial court made no such statement. In any event, the rehabilitation issue does not turn primarily upon defendant's testimony at all. There were twelve other witnesses, unimpeached and unrebutted on the issue, and the proof of change, rehabilitation and contribution to society stands uncontested in this case. Nor is this change some desperate, last-minute attempt by defendant to avoid the death penalty. The testimony indicated that the change in defendant's attitude and character manifested itself long before 1981 when *Watson II* first established that such a change was relevant in deciding whether to impose death.

Thus, the majority's conclusion on independent review that the trial court could have found defendant's changed character was not genuine, and therefore "could reasonably decline to find the proffered evidence to be a mitigating factor" is incorrect for two reasons. First, the trial court made no such finding. Second, there are no facts to support such a finding, even if it had been made. The State advances no such facts in this court, though it does not admit the change in character is genuine. Of

---

1. The conclusion that because of his change in character the defendant would serve as a useful role model for other prisoners is more than mere speculation. The May, 1983 issue of *La Roca*, a magazine published by and for prisoners at the Arizona State Prison, contains an article on defendant written by Charles Doss, a prisoner who serves as editor of the magazine. In an article commencing at page 19, entitled "Death Row Revisited," Mr. Doss writes of defendant's attitude and actions when he first came to death row ten years earlier and the

remarkable change which has taken place with the passage of years. The article illustrates that both inside and outside the walls of the state prison a man's life and behavior may set an example which serves as a standard for others. The article is not part of the record, but the statute provides that mitigating evidence may be considered regardless of admissibility under the rules of evidence and may consist of "any factors" relevant to defendant's character. A.R.S. § 13–703(C) and (G).

course, it is the State's obligation to examine any purported change in character with a deservedly cynical eye. I, too, agree that it would be better if felons found God before committing their crimes rather than before being punished. It is the court's obligation, however, to recognize the possibility and principle of redemption and rehabilitation.

Further, independent review on the death penalty issue involves more than a determination of whether the trial court's imposition of this penalty can be supported by the record. It requires our own, independent conclusion from the record. *Watson II,* 129 Ariz. at 63, 628 P.2d at 946. While the aggravating circumstances which were found to exist may indicate that the defendant was above the norm of murderers, the evidence of changed character is persuasive mitigation. Review of this record indicates strong evidence of rehabilitation and the probability that if allowed to live, defendant will make a contribution of some value to society. Then what is to be gained by imposing death under these circumstances? Except in the physical sense, the defendant whom we today consign to the gas chamber is not the same person who committed the crime in 1973 and was first sentenced to death in 1974. While the passage of time should not be the test, we must acknowledge that in the ten years which it has taken to reach this point, the defendant has been given time to change. Perhaps those ten years should not have been allowed to pass, but we must remember that the statutes under which the defendant was previously sentenced to death were declared unconstitutional, *State v. Watson* (*Watson I*), 120 Ariz. 441, 586 P.2d 1253 (1978), and, as a result, defendant has been given time which he has put to good use. While quick punishment may deter, punishment of this defendant at this time serves only to illustrate that redemption and rehabilitation have no practical purpose.

Speedy imposition of the ultimate penalty might also have served the societal interest in retribution. *See Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859 (1976). But, again, the imposition of death upon a defendant who has changed so remarkably serves no valid purpose as far as retribution is concerned, because we now visit society's retribution upon a different person. Nor is society protected by imposition of the death penalty since reduction to life imprisonment would ensure that this defendant would not become eligible for parole during his lifetime. By putting this defendant to death in the face of his efforts to change and the reasonable prospect that if allowed to live he will be of value to society, we accomplish nothing but revenge. To some, especially those in the heat of anger, this may seem a sufficient reason to kill. The law should not be swayed by such emotions; it does not and cannot kill in anger; it rejects the concept of an eye for an eye and a tooth for a tooth.

The totality of the evidence offered in mitigation establishes sufficient grounds for this court to reduce defendant's sentence to life imprisonment without possibility of parole for 25 years, to be served consecutively to all other sentences. Accordingly, I dissent from the portion of the opinion which, on independent review, affirms the imposition of the death sentence.