GORDON, Vice Chief Justice:
On December 10, 1981, a jury found appellant guilty of two counts of first degree murder, one count of conspiracy to commit first degree murder, one count of attempted first degree murder, three counts of kidnapping, three counts of armed robbery, and one count of first degree burglary. At a subsequent sentencing hearing, appellant was sentenced to death for each count of first degree murder, life imprisonment for the conspiracy count, twenty-one years imprisonment for the attempt count, twenty-one years imprisonment for each kidnapping count, twenty-one years for each armed robbery count, and twenty-one years imprisonment for the first degree burglary count. Timely appeal was filed from all convictions. This Court has jurisdiction under Ariz. Const, art. 6, § 5(3) and A.R.S. § 13-4031. We affirm the convictions and the sentences.
The facts in this case have been set out in some detail in our opinion in appellant’s co-defendant’s appeal, State v. Cruz, 137 Ariz. 541, 672 P.2d 470 (1983). We will set forth only those facts necessary for a full *152 understanding of the legal issues discussed herein.
On appeal, appellant has raised eight issues:
1. Whether the denial of his repeated motions to sever constitutes reversible error;
2. Whether the admission of certain “other bad act” evidence constitutes reversible error;
3. Whether Marilyn Redmond’s identification of him at his preliminary hearing was unduly suggestive thereby tainting her in-trial identification;
4. Whether the denial of his motion to suppress physical evidence seized in a search of his home constitutes reversible error;
5. Whether the admission of certain statements by alleged co-conspirators constitutes reversible error;
6. Whether the admission of certain photographs constitutes reversible error;
7. Whether the admission of testimony concerning the terms of Arnold Merrill’s plea agreement constitutes reversible error;
8. Whether A.R.S. § 13-703 is unconstitutional in that a judge rather than a jury determines sentence or in that no guidance is given as to what may be considered in mitigation.
Motion to Sever
Prior to and during trial, appellant made repeated motions to sever his trial from that of his co-defendant. All of these motions were denied. He now claims that such denial was reversible error. We disagree.
As we have made clear, a trial court must grant a motion to sever “if necessary to promote a fair determination of guilt or innocence of any defendant, or if the court detects the presence or absence of unusual features of the crime or case that might prejudice the defendant,” State v. Cruz, supra, 137 Ariz. at 543, 672 P.2d at 472; State v. McGill, 119 Ariz. 329, 580 P.2d 1183 (1978). Appellant claims that his defense was so antagonistic to that of his co-defendant Cruz that he was prejudiced by Cruz’ defense and that the trial should have been severed. In Cruz’ appeal to this Court, he made .a similar argument. We held there that to require severance based on antagonistic defenses, a defendant must show that his defense and that of his co-defendants) were mutually exclusive. State v. Cruz, supra. Examining the trial of McCall and Cruz, we found that their “defenses were not mutually exclusive * * * [and] did not require severance.” 137 Ariz. at 545, 672 P.2d at 474. We have no reason to disturb that finding. The trial court was not required to sever based on the nature of the defenses.
A defendant may, however, be prejudiced by the actual conduct of a co-defendant’s defense even where a severance is not mandated by the nature of the defenses. State v. Cruz, supra; United States v. Ziperstein, 601 F.2d 281 (7th Cir.1979), cert. denied, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980). Appellant points to the admission of “other bad act” evidence and to his waiver of his right to testify in his own behalf as indicia of that prejudice in his case.
Evidence of other wrongs is not generally admissible to show that the defendant is a bad person or has a propensity for committing crimes. State v. Hines, 130 Ariz. 68, 633 P.2d 1384 (1981). However, such evidence may be admitted for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Ariz.R.Evid. 404(b). It also may be admitted to complete the story of the crime. State v. Sanchez, 130 Ariz. 295, 635 P.2d 1217 (1981); State v. Reinhold, 123 Ariz. 50, 597 P.2d 532 (1979).
The “other bad act” evidence appellant complains of falls into two broad groups. The first involves testimony concerning a plan by Bracey, Hooper, and appellant to take over the drug business in South Phoenix and, in so doing, to murder an individual known as “Big Parker.” *153 Such evidence demonstrated the relationship appellant had with Bracey and Hooper. It helped explain to the jury what appellant meant when he told Mr. Merrill that he (appellant) was “changing sides” to join Bracey and Hooper and would be living “life in the fast lane.” We find such evidence properly admitted either as evidence of appellant’s motive in joining Bracey and Hooper in the Redmond murder or as evidence completing the story for the jury.
The remaining “other bad act” evidence complained of involves testimony from two witnesses regarding appellant’s participation in four earlier thefts. The identity of the participants in the four thefts was properly admitted in the joint trial because part of Cruz’ defense strategy was to assert that the Redmond killings were the result of a “botched robbery” in which appellant and others took part. Cruz’ attempt to show the similarity among these four thefts and the Redmond theft/murder was properly admitted as evidence of a common plan. State v. Mulligan, 126 Ariz. 210, 613 P.2d 1266 (1980); State v. Miller, 128 Ariz. 112, 624 P.2d 309 (App.1980). We find that no prejudice to appellant could have resulted from the testimony regarding the Klugman or Romero thefts because there was no testimony that appellant had been involved in them in any way. There was, however, testimony regarding appellant’s participation in the Spiegal and Bissett thefts. Had appellant’s motion to sever been granted, Cruz’ defense theories would obviously not have been before the jury and the introduction into evidence of appellant’s involvement in these latter two thefts would have been error. It would not, however, have been error requiring reversal. In view of the other overwhelming evidence against appellant, it is unlikely that a jury would have been prejudiced or outraged by the two prior thefts. See State v. Jackson, 124 Ariz. 202, 603 P.2d 94 (1979). Similarly, the introduction of this evidence into the joint trial did not create prejudice requiring severance.
Appellant’s second assertion of prejudice resulting from the denial of his motions to sever involves the waiver of his constitutional right to testify in his own behalf. Ariz. Const, art. 2, § 24. He argues that he was forced to forego that right because of the likely cross-examination on the “other bad act” evidence mentioned above. However, the “other bad act” evidence was properly admitted and, as appellant acknowledges, would therefore have been a proper subject for cross-examination. We find that appellant’s waiver of his right to testify was not compelled but rather, as the trial court ascertained, it was a knowing and voluntary waiver made with full and complete advice from counsel. Such waiver is effective, State v. Martin, 102 Ariz. 142, 426 P.2d 639 (1967); State v. Thornton, 26 Ariz.App. 472, 549 P.2d 252 (1976), and does not establish the prejudice necessary to mandate severance. See State v. Barry, 25 Wash.App. 751, 611 P.2d 1262 (1980).
Objection to Certain “Other Bad Act” Evidence
In addition to arguing that the “other bad act” evidence was prejudicial and therefore warranted severance, appellant asserts that certain testimony from Mr. Merrill concerning the possible takeover of the drug business in South Phoenix was irrelevant. However, as noted in the “Motion to Sever” section above, the complained-of testimony was relevant as evidence of appellant’s motive in joining Bracey and Hooper in the Redmond murders or as evidence completing the story for the jury. There was no error by the trial court in admitting this testimony over relevancy objections.
Pre-Trial Identification
Appellant asserts that he was denied due process of law when the trial court permitted the surviving victim, Marilyn Redmond, to identify him at his trial. Appellant argues that Mrs. Redmond’s identification of him at the preliminary hearing was the result of an unduly suggestive identifica *154 tion process and that her identification of him at trial was thereby tainted.
It is fundamental that every criminal defendant has a due process right to a fair identification procedure. See, e.g., Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); State v. Dessureault, 104 Ariz. 380, 453 P.2d 951, reh'g. denied, 104 Ariz. 439, 454 P.2d 981 (1969), cert. denied, 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970). Reliability is the linchpin in determining the fairness and admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Myers, 117 Ariz. 79, 570 P.2d 1252 (1977), cert. denied, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978). Even where a pre-trial identification process is unduly suggestive, the resultant in-court identification is admissible if, in view of the totality of the circumstances, the in-court identification is reliable. State v. Schilleman, 125 Ariz. 294, 609 P.2d 564 (1980).
Upon arrival of the police at the scene of the shooting, Mrs. Redmond initially indicated that her assailants had been three black men. She then changed her response, indicating that there had actually been two black men and one white man. Three days after the shooting, on January 3, 1981, Mrs. Redmond was shown a six-photograph lineup. It contained a picture of appellant. Mrs. Redmond was unable to make an identification. On January 7, Mrs. Redmond informed police detectives that she had seen an artist’s drawing of appellant on a television newscast, but that one of the police officers guarding her had immediately turned the television off. The next day, Mrs. Redmond was shown a videotaped lineup of six men, including appellant. Mrs. Redmond was again unable to make an identification.
On January 14, 1981, Mrs. Redmond attended appellant’s preliminary hearing. Appellant was present and sitting next to his attorney at the defense table. He was wearing handcuffs, leg manacles, and a white T-shirt with “MCSO” (Maricopa County Sheriff’s Office) printed across the front. Two uniformed deputies were in the courtroom; one sat directly behind the appellant while the other sat behind the prosecution. Mrs. Redmond, during her testimony, identified appellant as the one white man among her assailants. On June 19, 1981, appellant filed a Motion to Suppress seeking to preclude Mrs. Redmond from identifying him at trial and to suppress evidence of her identification of him at the preliminary hearing. After a three-day hearing on the issue, appellant’s motion was denied. Appellant now argues that this denial was error requiring reversal. We disagree. While the preliminary hearing was indeed suggestive, there are significant indicia of reliability surrounding Mrs. Redmond’s identification of appellant at that preliminary hearing. As such, the pri- or identification was admissible and there was no error in allowing Mrs. Redmond to identify appellant during the trial.
Factors considered in this determination of reliability include:
(1) the opportunity of the witness to view the criminal at the time of the crime,
(2) the witness’ degree of attention,
(3) the accuracy of the witness’ prior description of the criminal,
(4) the level of certainty demonstrated by the witness at the confrontation, and
(5) the length of time between the crime and the confrontation.
Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972).
Mrs. Redmond had three opportunities to observe appellant at the time of the crime. She first saw him in her family room where he was apparently holding a gun on her husband. The room was well-lighted; Mrs. Redmond was in the room for three to four minutes and was only a few feet away from appellant. Later, while one of the other assailants was looking for guns in a hall closet, Mrs. Redmond viewed her husband and appellant still in the family room. Her view was unobstructed and she was *155 but five to six feet from appellant. Mrs. Redmond’s third opportunity to see appellant was when he brought her husband into the master bedroom. That room was also well-lighted and Mrs. Redmond had a clear view of appellant for a minute or two. At each of these encounters, Mrs. Redmond’s attention was fixed upon appellant. He was holding a weapon on her husband as part of a three-man armed robbery. She testified at the hearing on appellant’s Motion to Suppress that while the second assailant was looking in the hall closet for guns, she “ * * * purposely moved over and looked around the corner to see what the white man [appellant] and [her] husband were still doing.”
Appellant argues strongly that Mrs. Redmond’s first description of her assailants as being three black men and her inability to identify appellant in either the photographic or videotaped lineup show a lack of accuracy that mandates suppression. However, the evidence at the hearing on appellant’s Motion to Suppress gave the trial court a more complete understanding of these occurrences. When found at the scene, Mrs. Redmond was lapsing in and out of consciousness, was in considerable pain, and was barely able to speak. Phoenix Police Officer Thomas Varela testified about his initial conversation with Mrs. Redmond:
“THE WITNESS: I asked her, she was in lots of pain and she could hardly talk and I said, ‘How many?’ She would say (witness makes grunting noise) ‘Three.’ It would come out in a muffled tone.
“I would say, ‘One?’ ‘No.’ ‘Two?’ ‘No.’ ‘Three?’ ‘Yes, three.’ That is the way my conversation went with her.
“THE COURT: How did the race business come out?
“THE WITNESS: I asked her, I said, ‘Black, White, Mexican,’ and then she’d say — I said, ‘Black?’ She said, ‘Yes.’ I said, ‘All three?’ She goes, ‘Yes — no, wait.’ And then at that point, I said; ‘Are you sure?’ She said, ‘No, wait. One was white.’ Then she gave me a description of the guy.”
Her description was quite detailed. Regarding the photographic lineup of January 3, 1981, the evidence at the hearing not only showed that the photograph of appellant was not a recent one but also indicated that Mrs. Redmond was still in the hospital’s Intensive Care Unit following the gunshot wound to her head, that she could not focus well, that she was in pain and on medication, and that she was really not cognizant of why she was looking at the photographs. Similarly, on January 8, 1981, at the showing of the videotaped lineup, Mrs. Redmond was still in the hospital, on medication, and had to be prompted to respond at all. She was being prepared for surgery, had double vision and had not yet regained the use o“f her left arm and leg. She testified that at the time she found it “difficult to even think.” Despite her condition, she did view the tape and, though not positively identifying anyone, did indicate that two of the men in the lineup looked like “possibilities.” One of these two men was appellant. As we have made clear, a witness’ previous inability to identify a defendant goes to the credibility of the witness, not the admissibility of subsequent identifications. State v. Myers, supra.
Mrs. Redmond’s identification came fourteen days after the crime. While we have ruled that, in at least one case, ten days after the crime was too distant to permit a reliable identification, State v. Strickland, 113 Ariz. 445, 556 P.2d 320 (1976), each case must be considered on its own facts. Examining the totality of the circumstances here, Mrs. Redmond’s identification of appellant fourteen days after the crime was not so late as to be per se unreliable.
Based on the foregoing factors and Mrs. Redmond’s testimony that, in making her identification at the preliminary hearing, she relied solely on her independent recollection of the night of the crime and would do so at trial, we find no error in the trial court’s refusal to suppress the identifications.
*156 Suppression of Physical Evidence
Appellant contends that a search of his home conducted pursuant to a search warrant was unlawful and in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. He asserts that the affidavit submitted in support of the search warrant did not provide the magistrate with sufficient probable cause upon which to issue the warrant. Therefore, he claims that the trial court’s denial of his Motion to Suppress and the subsequent admission of certain items into evidence was reversible error. We find no such error.[1] No search warrant shall be issued except upon probable cause. U.S. Const. Amend. IV; A.R.S. § 13-3913. Probable cause for the issuance of a search warrant exists where the facts and circumstances presented to the magistrate are based on personal knowledge or trustworthy information sufficient to warrant a person of reasonable caution to believe that seizable items are located on the premises to be searched. State v. Adamson, 136 Ariz. 250, 665 P.2d 972, cert. denied, — U.S. -, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983); State v. Maddasion, 24 Ariz.App. 492, 539 P.2d 966 (1975), aff'd., 130 Ariz. 306, 636 P.2d 84 (1981).
The affidavit appellant complains of is an eleven-page statement by a Phoenix police officer containing information about the Redmond burglary/murder and an earlier burglary. It includes considerable information from a confidential informant as well as information from the surviving victim and from other named citizens. Many details included in the informant’s statements are verified by the named citizens, by the surviving victim, and by independent police investigation. Such verification lends increased reliability to the statements of the informant. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).
Appellant argues that the affidavit lacked any facts from which the magistrate could conclude that his (appellant’s) car or home contained any of the items sought. We find, however, that the magistrate did have many detailed facts before him. The affidavit included, among other things, the victim’s physical description of the assailants, a description of appellant, a description of an unfamiliar car seen at the Redmond residence near the time of the killings, a description of a car in which appellant and two companions were riding the evening of the killings, a description of a car owned by appellant, a description of the type of tape purchased by a white man and two black men the day of the Redmond killings, a description of the type of tape appellant and his two black companions had with them on the evening of the killings, a description of the type of tape used to bind the victims, a statement that the type of tape was known only to police investigators and not to the press, a description of a brown pouch-type briefcase carried by the assailants, a description of a brown pouch-type briefcase owned by appellant, the fact that the informant had physically produced a brown pouch-type briefcase containing a .410 gauge sawed-off shotgun and two street maps, the fact that one of those street maps had a pen mark at the approximate location of the Redmond residence, and the fact that the informant told the affiant that appellant had admitted committing the killings. This Court has repeatedly held that affidavits for search warrants should be interpreted in a common-sense and realistic fashion. Adamson, supra; State v. Watson, 113 Ariz. 218, 550 P.2d 89 (1976).[2] From the *157 facts detailed in the affidavit, it was not an unreasonable conclusion that items sought, which included the clothing described by the victims, a receipt from the purchase of the tape used to bind the victims, and dog hair from the Redmond’s dog, would indeed be found in appellant’s car or home. See United States v. Lucarz, 430 F.2d 1051 (9th Cir.1970); State v. Torrez, 112 Ariz. 525, 544 P.2d 207 (1975), cert. denied, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 767 (1976). The affidavit further indicated that appellant had told the informant that the Redmond murder, though actually a contract killing, had been designed to look like a robbery. Thus, it was not unreasonable for the magistrate to conclude that the jewelry and other items taken would not have been quickly disposed of as might be the case in a “normal” robbery or burglary but would still be at appellant’s home. As we find no clear and manifest error, we uphold the trial court’s denial of appellant’s Motion to Suppress. See State v. Walker, 119 Ariz. 121, 579 P.2d 1091 (1978).
Co-conspirator’s Admissions
Appellant argues that certain statements made by Bracey and Hooper in January, 1981 were improperly admitted because they were hearsay. The trial court admitted the statements pursuant to Ariz.R. Evid. 801(d)(2)(E). Appellant asserts that this was error. Appellant’s co-defendant Cruz made an identical argument in his appeal to this Court. After full analysis, we held there that the evidence was properly admitted under Rule 801(d)(2)(E). State v. Cruz, supra, 137 Ariz. at 547-548, 672 P.2d at 476-477. We find no reason to alter that holding nor to repeat the analysis here. The statements were properly admitted.
Gruesome Photographs
[18-20] Appellant asserts that the admission of seven photographs, to which he objected at trial, was error because their prejudicial effect outweighed their probative value. Photographs that tend to arouse the emotions of the jurors may be admitted if they are relevant and if their probative value outweighs the danger of unfair prejudice attendant to their admission. State v. Grilz, 136 Ariz. 450, 666 P.2d 1059 (1983); State v. Chapple, 135 Ariz. 281, 660 P.2d 1208 (1983); State v. Gerlaugh, 134 Ariz. 164, 654 P.2d 800 (1982). The decision to admit such photographs is within the sound discretion of the trial court and will be disturbed on appeal only if that discretion is abused. State v. Grilz, supra; State v. Clark, 126 Ariz. 428, 616 P.2d 888, cert. denied, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). Applying this test to the instant case we find no reversible error.[3] The first three photographs show Mrs. Phelps’ bullet wounds. One shows the entry wound in her left cheek, another shows the corresponding exit wound in her right cheek, the third shows the entry wound in the back of her head. These photographs were taken during the autopsy after the body had been cleaned. Still, they do show a significant amount of blood and we agree with appellant that they are somewhat inflammatory. The fourth photograph shows Pat Redmond’s wounds. It shows the compound entry wound on the side of his head as well as his slit throat. This photograph was also taken during the autopsy and is inflammatory. We cannot, however, say the trial court abused its discretion in determining that these four photographs were relevant and that their probative value outweighed any danger of unfair prejudice they may have caused. Appellant and Cruz were charged, among other things, *158 with first degree premeditated murder. Consequently, the state was required to prove that the killings were premeditated and intentional. The similar placement and number of gunshot wounds, illustrated in the photographs, tend to indicate a careful, deliberate act done with the intent to kill.' Therefore, the photographs may have helped the jury determine whether the killings were premeditated and intentional. State v. Hallman, 137 Ariz. 31, 668 P.2d 874 (1983); State v. Hicks, 133 Ariz. 64, 649 P.2d 267 (1982). Furthermore, the state’s theory of the case was that the killings were planned, gangland-style executions. Again, the placement and number of gunshot wounds as well as the cutting of Pat Redmond’s throat tend to support this theory. Consequently, the photographs were relevant. State v. Grilz, supra; State v. Caldwell, 117 Ariz. 464, 573 P.2d 864 (1977).
The fifth and sixth photographs show the faces of Pat Redmond and Mrs. Phelps, respectively. They, too, were taken during the autopsies. These photos, by themselves, are not particularly inflammatory. They are, however, cumulative. Neither photograph shows anything of significance that the previously discussed photographs do not show better. As they are merely cumulative and not inflammatory, their admission into evidence, if error at all, was harmless.
The seventh photograph shows the body of Pat Redmond lying on the bedroom floor of his home. His hands are taped behind his back, he is gagged, his head and shirt are soaked with blood, and the cut on his neck is clearly visible. This photograph is inflammatory. However, we do not find that the trial court abused its discretion in admitting it. Though other possibly less inflammatory photographs show Pat Redmond’s general position in the bedroom, this photograph was the only one available that showed his entire body. Other photographs showed tied hands, a turned-out pocket, and a gagged face, but, if shown only those, the jury would have had to be told that the hands, the pocket, and the face were those of Pat Redmond. Each member of the jury would have then had to piece together in his own mind where the body was in the room and what it looked like when found. This photograph alleviated the need for such speculation and, as such, was properly admitted.
Appellant further argues that, because he and his co-defendant offered to stipulate to the identity of the two murder victims and the time, mode, manner, and cause of their deaths, the photographs of the victims were unnecessary and should have been excluded. This offer of stipulation does not render the photographs irrelevant. State v. Gerlaugh, supra. Again, the state had charged appellant with first degree premeditated murder. These photographs support the theory that the murders were well-planned and deliberate. The intent of the killers was an element the state had to prove, but was never part of the proposed stipulation. Further, we cannot compel the state “to try its case in a sterile setting.” State v. Chapple, 135 Ariz. at 289-90, 660 P.2d at 1217. We find no error in the admission of the photographs.
Plea Agreement Testimony
 Appellant argues that it was error to allow Arnold Merrill to testify that one of the terms of his plea agreement was that he testify truthfully whenever called upon by a state or federal law enforcement agency. Appellant asserts two bases for his argument. The first is that such testimony is irrelevant as it has no tendency to make any fact in issue more or less probable. See Ariz.R.Evid. 401. However, as we have made clear, any evidence that substantiates the credibility of a prosecution witness on the question of guilt is material and relevant and may be properly admitted. State v. Thomas, 130 Ariz. 432, 636 P.2d 1214 (1981); State v. Mosley, 119 Ariz. 393, 581 P.2d 238 (1978). Because Mr. Merrill’s credibility and his motives for testifying were proper subjects for jury determination, we find no abuse of discretion by the *159 trial court in admitting this testimony over relevancy objections.
Appellant’s second contention is that such testimony constitutes vouching by the prosecution. Improper vouching takes two forms: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness’ testimony. United States v. Roberts, 618 F.2d 530 (9th Cir.1980), cert. denied, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981) citing Lawn v. United States, 355 U.S. 339, 359-60 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321, 335 n. 15 (1958). Here, as in Roberts, vouching of the second type is charged. In Roberts, a witness’ plea agreement, containing a provision that he testify truthfully, was admitted into evidence. In his closing argument, the prosecutor mentioned the plea agreement, then pointed out a detective sitting in the courtroom. That detective, the prosecutor told the jury, “had a mission to serve and that mission was to sit and listen to the testimony of [the immunized witness].” Id. at 533. The Ninth Circuit Court of Appeals held that the prosecutor committed reversible error by using the detective as an unsworn witness to the immunized witness’ truthfulness and credibility.
In the instant case, the prosecutor’s actions were not so egregious. Appellant’s charge of vouching is based solely on the following interaction:
“Q. [by the prosecutor]: As a result of your guilty plea, did you make any promises?
“A. [by Mr. Merrill]: Yes, sir.
* * * * * *
“Q. What did you promise to do?
“A. To testify truthfully whenever called upon before any State or Federal law enforcement agency.”
We find nothing improper in this questioning. The prosecutor did not express any personal opinion regarding the truth of Mr. Merrill’s testimony nor did he refer in his questioning or in his closing argument to any information outside the knowledge of
the jury. Appellant and his co-defendant had and used the opportunity of cross-examining Mr. Merrill to attack his credibility and character. In addition, the trial court’s response to the objection at trial made clear that, merely because Mr. Merrill had promised to tell the truth, there was no guarantee that he had. The jury instructions also reiterated that the jury should take into account any motive or prejudice that any witness might have. Despite this, appellant argues that the “inevitable implication” from knowing that certain charges could be reinstated if Mr. Merrill lied was that the prosecutor, from information not presented to the jury, knew the truth and became, in effect, an unsworn witness to Mr. Merrill’s credibility. We disagree. The above-quoted testimony does not amount to improper vouching but simply demonstrates that the witness had no motive to testify falsely. See United States v. Ricco, 549 F.2d 264 (2d Cir.), cert. denied, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977) and cases cited therein. Had this precise testimony come on redirect examination after the expected strenuous defense attack on Mr. Merrill’s credibility and character, the rehabilitative questioning would have obviously been allowed. United States v. Armedo-Sarmiento, 545 F.2d 785 (2d Cir.1976), cert. denied, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977). As the prosecution would not be precluded from responding to a defense attack on a witness’ credibility, we will not prohibit it from using such questions on direct examination. State v. Fleming, 117 Ariz. 122, 571 P.2d 268 (1977); State v. Duffy, 124 Ariz. 267, 603 P.2d 538 (App. 1979).
Constitutionality of A.R.S. § 13-703
Appellant raises two challenges to the constitutionality of A.R.S. § 13-703. He first contends that the statute, which provides for judge rather than jury determination of the sentence upon conviction of first degree murder, is unconstitutional because it denies him the right to a trial by jury. Though a trial by jury is indeed mandated by the Sixth and Fourteenth *160 Amendments to the United States Constitution, it is clear that sentencing by jury is not constitutionally required. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); State v. Blazak, 131 Ariz. 598, 643 P.2d 694 (1982); State v. Schad, 129 Ariz. 557, 633 P.2d 366 (1981); State v. Watson, 120 Ariz. 441, 586 P.2d 1253 (1978), cert. denied, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979).
Appellant further argues that A.R.S. § 13-703 is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because it gives no guidance as to what constitutes a mitigating circumstance or as to how to balance aggravating factors against mitigating factors. We have previously considered these arguments and consistently rejected them. See, e.g., State v. Woratzeck, 134 Ariz. 452, 657 P.2d 865 (1982); State v. Ortiz, 131 Ariz. 195, 639 P.2d 1020 (1981); State v. Mata, 125 Ariz. 233, 609 P.2d 48, cert. denied, 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980).
Sentencing
Although appellant did not contest the imposition of the death penalty, we have independently reviewed the record to determine if the trial court correctly applied the aggravating and mitigating circumstances and correctly imposed the death penalty. State v. Adamson, supra; State v. Gretzler, 135 Ariz. 42, 659 P.2d 1 (1983). The sentencing court found three statutory aggravating circumstances: A.R.S. § 13-703(F)(3) (that appellant knowingly created a grave risk of death to another person in addition to the two victims of the offense); A.R.S. § 13-703(F)(5) (that appellant committed the offense as consideration for the receipt, or in expectation of the receipt, of something of pecuniary value); and A.R.S. § 13-703(F)(6) (that appellant committed the offense in an especially heinous, cruel or depraved manner).
The sentencing judge based his finding of the evidence of an aggravating circumstance under A.R.S. § 13 — 703(F)(3) on the fact that Marilyn Redmond was lying on the bed bound and gagged at the time of the two murders. In the special verdict issued pursuant to A.R.S. § 13-703(D), the sentencing judge concluded that Mrs. Redmond was, therefore, “clearly in the ‘zone of danger’ and was in fact shot in the head but miraculously survived.” We cannot take issue with this statement of the facts, but we disagree with the sentencing judge’s conclusion that these facts constitute the aggravating circumstance envisioned by A.R.S. § 13 — 703(F)(3).
A.R.S. § 13-703(F)(3) provides that the sentencing court must consider it an aggravating circumstance if “[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense.” In each of the Arizona cases where the finding of this aggravating circumstance has been affirmed, the murderous act itself put other people in a zone of danger. See State v. McMurtrey, 136 Ariz. 93, 664 P.2d 637 (1983) (defendant fired several shots in a crowded bar); State v. Ortiz, supra (defendant set fire to a house to dispose of victim’s body knowing that three young children were inside); State v. Doss, 116 Ariz. 156, 568 P.2d 1054 (1977) (defendant fired several shots in a crowded college gymnasium); State v. Blazak, supra (defendant fired several shots in a crowded bar). Cf. State v. Jeffers, 135 Ariz. 404, 661 P.2d 1105 (1983) (defendant pointed a gun at a third party merely to quiet her; subsequent murder of victim by other means did not subject third party to danger); State v. (Raymond) Tison, 129 Ariz. 546, 633 P.2d 355 (1981), cert. denied, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982) and State v. (Ricky) Tison, 129 Ariz. 526, 633 P.2d 335 (1981), cert. denied, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982) (though each of three victims’ bodies were close enough to the other two that the shooting of any one of the three created a grave risk of danger to the other two, the indication that each victim was intentionally murdered foreclosed application of A.R.S. § 13-454(E)(3) (now A.R.S. § 13-703(F)(3)) to the sentencing); State v. *161 Clark, supra (third party in another room at time defendant shot victim was not within the zone of danger). We find the instant case to be most analogous to the Tison cases. As was the case in Tison, here Pat Redmond, Marilyn Redmond, and Helen Phelps were on the bed close enough to each other that the shooting at any one of them did place the other two in grave risk of danger. However, the evidence at appellant’s trial indicated that the killers intended to murder all three individuals. The shooting in the bedroom was not random or indiscriminate; rather, it was purposeful and intentional. That Marilyn Redmond miraculously survived does not alter this. We conclude that A.R.S. § 13-703(F)(3) has no application to this case.[4]
Evidence was admitted at appellant’s trial which supports a finding of an aggravated circumstance under A.R.S. § 13-703(F)(5). Witness Arnold Merrill testified that appellant told him, Merrill, of his, appellant’s, participation in the killings and expectation of receiving $10,000 in payment therefor. There is no doubt that A.R.S. § 13-703(F)(5) applies to the “hired gun” situation. State v. Adamson, supra; State v. Gretzler, supra. In such a situation, a defendant clearly commits “the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.” This aggravating circumstance was properly found.
The final aggravating circumstance found by the sentencing court was that “[t]he defendant committed the offense in an especially heinous, cruel or depraved manner.” A.R.S. § 13-703(F)(6). This Court has defined cruelty as involving the infliction of pain on a victim. State v. Gretzler, supra; State v. Knapp, 114 Ariz. 531, 562 P.2d 704 (1977), cert. denied, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). Such pain can be either physical pain or mental distress. State v. McDaniel, 136 Ariz. 188, 665 P.2d 70 (1983); State v. Gretzler, supra. The defendant must intend that the victim suffer or reasonably foresee that there is a substantial likelihood that the victim will suffer as a consequence of the defendant’s acts. State v. Adamson, supra. Applying this standard to the facts at hand, we find that the murders were committed in a cruel manner. The Redmonds and Mrs. Phelps were herded about the Redmond home at gunpoint by three men. After giving up their valuables, they were forced to lie down on a bed, had their hands taped behind their backs, and were gagged with socks. They knew that their captors were armed. It may be inferred that they were uncertain as to their ultimate fate. State v. Steelman, 126 Ariz. 19, 612 P.2d 475 (1980). Except for the first victim, each of them had to endure the “unimaginable terror” of having their loved ones shot to death within their hearing and then having to wait for their own turn to come. State v. Gretzler, 135 Ariz. at 53, 659 P.2d at 12. Such mental distress clearly constitutes cruelty. State v. Gretzler, supra; State v. Steelman, supra. In addition, expert medical testimony was given that Mrs. Phelps did not die from the first gunshot wound to her head, that she did not lose consciousness as a result thereof, and that she most certainly suffered pain from that wound. The infliction of such physical pain also clearly constitutes cruelty.
 We need not, however, rest our affirmation of the sentencing judge's finding of this aggravating factor on the notion of cruelty alone. There is also evidence that the murders were committed in a heinous or depraved manner. In contrast to the emphasis upon the feelings and sufferings of the victims in the case of cruelty, the A.R.S. § 13-703(F)(6) concepts of “heinous” and “depraved” involve the killer’s vile state of mind at the time of the murder. State v. Gretzler, supra. Several sorts of actions on the part of a killer have led to a finding of depravity or heinousness. One such action is the infliction of gratuitous violence on or the needless mutilation of the victim. See, e.g., State v. *162 Jeffers, supra (defendant beat dead victim about the face and buried body in a shallow grave); State v. Woratzeck, supra (defendant strangled the victim, stabbed her three times in the chest, and struck her twice on the head, where any one of the attacks was potentially fatal); State v. Smith, 131 Ariz. 29, 638 P.2d 696 (1981) (defendant murdered two girls by asphyxiation but also mutilated their breasts and their genital areas); State v. Vickers, 129 Ariz. 506, 633 P.2d 315 (1981) (after strangling his victim, defendant carved the word “Bonzai” into the victim’s back); State v. Ceja, 126 Ariz. 35, 612 P.2d 491 (1980) (defendant repeatedly shot and kicked his victims after they were unconscious or dead). In the instant case, Pat Redmond was not only shot twice through the head but also had his throat cut open. Expert medical testimony established that the slashing came just at the time of Redmond’s death or shortly thereafter. In addition, there was also testimony that this mutilation was designed to be a “message” to warn other people. A second consideration that has led to a finding of depravity or heinousness is the senselessness of the crime or the helplessness of the victim. See, e.g., State v. Zaragoza, 135 Ariz. 63, 659 P.2d 22 (1983) (helplessness of victim shown by her advanced age and limited mental capabilities); State v. Ortiz, supra (indiscriminate attacks on three young children following the murder of their mother); State v. (Ricky) Tison, supra (helplessness shown by very young age of one victim and senselessness of murders demonstrated by the inability of the victims to escape). The sentencing judge found that the murder of Helen Phelps was particularly senseless. We agree. She was an elderly houseguest of the Redmonds with no possible interest in their business affairs. Her murder in no way furthered the plan of the killers. Having fully reviewed the record, we agree with the sentencing judge that the evidence supported the finding of an aggravating circumstance under A.R.S. § 13-703(F)(6).
The sentencing judge found no statutory mitigating circumstances under A.R.S. § 13-703(G). We have reviewed the record and concur. As a non-statutory mitigating circumstance, appellant urged the sentencing court to consider the fact that the testimony used to establish some of the aggravating circumstances was that of Arnold Merrill and that parts of his testimony had been contradicted by other witnesses. The sentencing court found no such contradictions and therefore found no mitigating circumstance as urged by appellant. We agree with the sentencing court that, whatever contradictions existed to Mr. Merrill’s testimony, they were not of such a magnitude to warrant exclusion of that testimony from consideration in sentencing. When a defendant is being sentenced for first degree murder, the sentencing court must consider, in addition to the mitigating circumstances of A.R.S. § 13-703(G), any aspect of the defendant’s character or record and any circumstance of the offense relevant to determining whether a sentence less than death might be appropriate. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); State v. McDaniel, supra. Thus, the quality of the evidence at appellant’s trial was a proper consideration for the sentencing court and for this Court on review. We find, however, that this mitigation evidence is not sufficiently substantial to outweigh the existing aggravating circumstances. A.R.S. § 13-703(E). The death sentence is appropriate in the instant case.
In addition to independently reviewing the propriety of the sentence in each capital case, this Court also examines prior cases to assure that the death penalty is not disproportionately applied. We consider not only prior cases where the death penalty was imposed upon a finding of the same aggravating circumstances but also prior cases where the death penalty was lessened to a sentence of life imprisonment. Here, we have examined cases in which the defendant received the death penalty on one or both of the aggravating circumstances found in appellant’s case. See, e.g., State v. Adamson, supra (despite existence of mitigating factors, death penalty affirmed upon finding that the killing was *163 done for pecuniary gain and in a cruel manner); State v. Gillies, 135 Ariz. 500, 662 P.2d 1007 (1983) (despite young age of defendant, death penalty affirmed upon finding that the killing was done in a cruel manner); State v. Woratzeck, supra (no mitigating circumstances shown; death penalty affirmed upon finding that the killing was done for pecuniary gain and in a heinous and depraved manner); State v. (Raymond) Tison, supra (despite young age and minimal prior criminal activity of defendant, death penalty affirmed upon finding that the killing was done for pecuniary gain and in a cruel, heinous or depraved manner); State v. Bishop, 127 Ariz. 531, 622 P.2d 478 (1980) (despite below average intelligence and lack of prior criminal record of defendant, death penalty affirmed upon finding that the killing was done in a heinous and depraved manner); State v. Clark, supra (despite defendant’s young age, emotional problems, poor childhood home life, and lack of adult criminal record, death affirmed upon finding that the killing was done for pecuniary gain and in a depraved manner); State v. Ceja, supra (no mitigating circumstances shown; death penalty affirmed upon finding that the killing was done in a heinous and depraved manner). We have also examined cases in which the death penalty was reduced to life imprisonment. See, e.g., State v. McDaniel, supra (finding of lack of intent to kill outweighed finding that the killing was done in a cruel manner); State v. Graham, 135 Ariz. 209, 660 P.2d 460 (1983) (findings of defendant’s diminished capacity to appreciate the wrongfulness of his conduct, lack of other adult convictions, and no tendency toward violent crime outweighed finding that the killing was done for pecuniary gain); State v. Watson, 129 Ariz. 60, 628 P.2d 943 (1981) (young age of defendant, the findings that defendant had been a model prisoner and was furthering his education in prison, and the fact that the killing had occurred during a shootout in which the victim fired first outweighed finding of prior conviction punishable by life imprisonment and involving the use or threat of force); State v. Brookover, 124 Ariz. 38, 601 P.2d 1322 (1979) (finding of defendant’s diminished capacity to appreciate wrongfulness of his conduct outweighed finding of prior conviction punishable by life imprisonment). We find that imposition of the death penalty in this case is not disproportionate to the imposition of the death penalty in prior cases in this state. We believe the imposition of the death penalty is justified.
Pursuant to A.R.S. § 13-4035, we have examined the entire record for fundamental error and have found none. The judgments of conviction and the sentences are affirmed.
HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.
SUPPLEMENTAL OPINION
GORDON, Vice Chief Justice:
The matter is before us on a motion for reconsideration. Appellant has raised two arguments that pertain to the admission into evidence of certain testimony by Morris Nellum. See “Co-conspirator’s Admissions” section, supra at 930. He argues, first, that Nellum’s statements were not made in furtherance of the alleged conspiracy and, second, that he was denied his right of confrontation guaranteed by the sixth and fourteenth amendments.
Appellant’s claim that the complained-of statements were not made “in furtherance of the conspiracy” as required for admission under Ariz.R.Evid. 801(d)(2)(E) is untimely. Ariz.R.Crim.P. 31.13(c)(1)(iv) provides that the opening brief in a criminal appeal should include “[a] concise argument containing the contentions of the party, the reasons therefor, and necessary supporting citations.” Failure to argue a claim constitutes abandonment, State v. Smith, 125 Ariz. 412, 610 P.2d 46 (1980); State v. Blodgette, 121 Ariz. 392, 590 P.2d 931 (1979), and waiver thereof. Appellant’s opening brief contains argument that the statements were “rank hearsay” as well as arguments that “the conspiracy [had] ended at the moment *164 [Pat Redmond] died” and, thus, was not ongoing at the time the statements were made. While the brief clearly raised the issue of whether the statements were made during or in the course of the conspiracy, it did not raise the issue of whether the statements promoted the goals or were made in the furtherance of the conspiracy. The claim having been waived, it may not be asserted in a motion to reconsider.
Appellant’s confrontation clause argument was made in his opening brief in a single, conclusory statement:
“The admission of Hooper’s statements to Nellum in evidence against McCall also denied McCall his right under the Sixth and Fourteenth Amendments to the United States Constitution to confront Hooper who did not testify at the trial.”
Initially, we note that this conclusory statement meets neither the letter nor the spirit of Ariz.R.Crim.P. 31.13(c)(1)(iv). However, because the sixth amendment right to confrontation is fundamental, Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), we will address appellant’s claim.
This Court has recently set forth a two-pronged analysis to be used in evaluating confrontation clause claims, State v. Martin, 139 Ariz. 466, 679 P.2d 489 (1984). The first prong of the analysis is unavailability of the declarant. While acknowledging that a demonstration of unavailability should be the general rule, in Martin, we stated that “[i]f the analysis shows [that] the utility of confrontation would be insignificant, the statement may be admitted even without a showing of unavailability.” Id. at 480, 679 P.2d at 503 [slip op. at 26]. We note that, at the time of appellant’s trial, Hooper (the declarant) had been arrested and was himself awaiting trial for first degree murder. The state did not attempt to produce Hooper at appellant’s trial nor was there any record made by the state concerning the likelihood of Hooper’s using his fifth amendment privilege if he was called. Thus, we cannot determine if Hooper was truly legally unavailable. However, we also note that appellant made no record of any request that Hooper be produced for direct confrontation. Appellant must have considered, and thereby conceded, that the utility of confrontation was insignificant.
The second prong of this analysis is the reliability of the statement. In Martin, we enumerated several factors by which a statement’s reliability should be tested. They include:
(1) whether the declaration contained assertions of past fact;
(2) whether the declarant had personal knowledge of the identity and role of the participants in the crime;
(3) whether it was possible that the declarant was relying upon faulty recollection;
(4) whether the circumstances under which the statements were made provided reason to believe that the declarant had misrepresented the defendant’s involvement in the crime; and
(5) whether the declaration was “crucial” to the state or “devastating” to the defense.
Id. at 479, 679 P.2d at 502 [slip op. at 24], Each of these elements need not be present in order to satisfy the confrontation clause. Id. at 479, 679 P.2d at 502 [slip op. at 24].
Nellum was Hooper’s chauffeur in Chicago and was allowed to testify at appellant’s trial about Hooper’s activities during the months before and after the Redmond murders. He was also allowed to testify about statements made by Hooper. These statements included admissions by Hooper that he had been in Arizona on New Year’s Eve, 1980, that while there he and others had killed three people, and that certain money he obtained was payment for those killings. Nellum was also allowed to testify as follows:
“Q. [by the prosecutor]: Mr. Nellum, how many people did Mr. Hooper indicate to you were involved [in the killings] besides himself and Mr. Bracey?
“A. Two other people.
*165 “Q. What did he say about these two other people, if you recall?
“A. He just said that one guy was an ex-policeman, that is all.”
Having evaluated Hooper’s statements, we find several indicia of reliability. It is clear that the declarant, Hooper, had personal knowledge of the identity and the roles of each of the participants in the murders of Pat Redmond and Helen Phelps. There is nothing to indicate that Hooper’s memory was in any way faulty; he was speaking of recent and still ongoing events. Also, the circumstances do not suggest any reason for Hooper to misrepresent the degree of involvement of appellant or any other of his coconspirators. His statements were clearly against his penal interest and he made no attempt to downplay his own involvement by enlarging the involvement of others. He merely related information about his co-conspirators. Finally, we do not find his statements particularly critical to the state or particularly devastating to the defense. Appellant was not mentioned by name; he was not directly implicated in any wrongdoing. While appellant may have formerly been a police officer, we are not cited to any reference which indicates that the jury was aware of that. Also, the testimony concerning Hooper’s activities during the conspiracy, while adding credence to the state’s conspiracy theory, was not crucial' to the state’s proof that appellant was involved in it. We find that admission of Hooper’s statements via Nellum’s testimony did not violate appellant’s right of confrontation.
These matters having now been considered, the motion for reconsideration is denied. The judgments of conviction and the sentences are affirmed.
HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.

. We find this search warrant- to have been issued upon probable cause sufficient under Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and under Illinois v. Gates, - U.S. -, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). As such, we need not determine the retroactivity of Gates.

. This view was recently ratified by the United States Supreme Court in Gates, supra, - U.S. at -, 103 S.Ct. at 2332, 76 L.Ed.2d at 548:
“The task of the issuing magistrate is simply to make a practical, common-sense decision *157 whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and ‘basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a ‘substantial basis for * * * concluding]’ that probable cause existed."
We conclude that the magistrate in this matter had such a substantial basis.

. We express no opinion as to the admissibility of photographs not objected to.

. The elimination of this one aggravating factor does not mandate a remand to the trial court for resentencing. Barclay v. Florida, - U.S. -, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983).